Joseph STACHER, Appellant,

. v.

UNITED STATES of America,
Appellee.

No. 15453.

United States Court of Appeals
Ninth Circuit.

July 15, 1958.

J. E. Simpson, Frank P. Doherty, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Max F. Deutz, Arline Martin, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before CHAMBERS and BARNES, Circuit Judges, and JERTBERG, District Judge.

BARNES, Circuit Judge.

This is an appeal from a judgment entered by the District Court of the United States for the Southern District of California, Central Division, revoking and setting aside an order of the United States District Court of the State of New Jersey, made on or about May 12, 1930, admitting the defendant Joseph Stacher to United States citizenship; and cancelling his Certificate of Naturalization, No. 3275913.

The judgment appealed from was entered on an amended complaint filed by the United States Attorney for the Southern District of California pursuant to Section 340(a) of the Immigration and Nationality Act of 1952 (66 Stat. 260), 8 U.S.C.A. § 1451(a),[1] in which it is alleged that appellant's naturalization in the New Jersey District Court on May 31, 1930, was procured upon sworn statements of appellant and his allegations under oath which amounted to concealment of material facts and material misrepresentation with respect to his moral character, his use of other names and his previous arrests.

The matter was tried by the court, sitting without a jury, no jury having been requested.

The material facts concealed and the misrepresentations charged related to (1) appellant's moral character; (2) various arrests and charges of violation of law prior to January 22, 1930 (the date appellant's petition for naturalization was filed); (3) the use of names other than Gdale Oistaczer and Joe (or Joseph) Stacher (including Joe or Joseph Rosen, J. P. Harris, Doc Harris, Doc Stacher, George Kent, and Harry Goldman); (4) his association with gang-

---

1. 8 U.S.C.A. § 1451(a), revocation of naturalization, reads as follows in material part:

"(a) It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 1421 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and cancelling the certificate of naturalization on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation * * *. If the naturalized citizen does not reside in any judicial district in the United States at the time of bringing such suit, the proceedings may be instituted in the United States District Court for the District of Columbia or in the United States district court in the judicial district in which such person last had his residence. As amended, Sept. 3, 1954, c. 1263, § 18, 68 Stat. 1232."

sters and bootleggers, and membership in the "Third Ward Gang" of Newark, New Jersey. The amended complaint charged the following "arrests and charges" which appellant had failed to disclose:

(1) November 26, 1924, for breaking, entering, and larceny;

(2) April 21, 1926, for assault and battery;

(3) August 18, 1926, for assault and battery;

(4) June 7, 1927, for atrocious assault and battery;

(5) July 11, 1927, for atrocious assault and battery;

(6) August 15, 1927, for robbery;

(7) December 4, 1927, for interfering with officer guarding still for Federal authorities;

(8) December 9, 1927, for atrocious assault and battery, and fined $50;

(9) May 29, 1928, "open charge" (dismissed).[2]

Defendant, by amended answer, denied the May 29, 1928, arrest and charge and explained the December 4, 1927, arrest and charge.[3] As to the other arrests appellant admitted "he was either arrested or notified to appear before, a court or courts in the City of Newark, State of New Jersey, having jurisdiction over the offenses filed in said courts, charging Joseph or Joe Rosen or Joseph Stacher with the commission of the [said] offenses."

Appellant further raised the separate defenses that no cause of action was stated, res adjudicata, estoppel and laches, the Statute of Limitations, lack of jurisdiction over appellant because of his residence in a different jurisdiction (to-wit: Nevada) at the time the complaint was filed and served (February 2nd and 3rd, 1953, respectively[4]), and inadequacy of the affidavit filed with the complaint. By pretrial motion, all separate defenses were stricken.

Appellant made a motion to quash, dismiss or transfer the case, upon ground of improper venue, which was denied after hearing. This issue was again raised at the trial and extensive evidence was introduced by both sides. Again the court ruled that appellant, for the purposes of the Act under which he was here charged, "resided" within the Southern District of California.

The trial judge, by pretrial order pursuant to Rule 16, Federal Rules of Civil

---

2. In the Amended Complaint, three additional arrests and charges were listed:

"11–11–1931—New York City, N. Y., as Joseph Rosen, No. B–98013, Violation Section 722 P.L. (Disorderly Conduct). On 12–24–31, Mgst. Gottlieb, 1st Crt., discharged.

"9–8–1952—Indicted by the Extraordinary Grand Jury sitting in Saratoga County, N. Y., for crimes of Conspiracy and Forgery in the third degree ETC, see copy of letter from Department of Law, State of New York, dated November 6, 1952, in folder.

"9–9–1952—Wanted: As Doc Stacher on teletype alarm by State Police, Saratoga, N. Y.—NZB—14251. (In Custody Ely, Nevada, and fighting extradition to New York State as of 1–13–1953)." (Appellee's Exhibit B.)

Appellant answers these matters by stating "they had no relationship whatsoever to the granting of defendant's petition for citizenship, as they had not occurred prior to that time." With this we agree.

3. In his answer, appellant denied the December 4, 1927 charge and alleged on December 5, 1927 "two separate complaints were filed in said court in Newark, New Jersey by the same complainant, charging this defendant as Joseph Rosen, with (a) violation of § 3 of an Act Concerning Disorderly Persons, and (b) with attempted atrocious assault and battery; that no further proceedings were had as to the first of said charges alleging a violation of An Act Concerning Disorderly Persons and that as to the second complaint charging attempted atrocious assault and battery, defendant was adjudged guilty of the lesser offense of assault and battery and fined fifty dollars."

4. The Return of Service shows personal service on defendant by leaving a copy with defendant's wife, Mrs. Miriam Stacher, at his residence, 721 North Beverly Drive, Beverly Hills, California.

Procedure, 28 U.S.C., ruled that evidence of specific acts or conduct would not be admissible at the trial to prove the good or bad character of defendant. However, he permitted the government to make an offer of proof for the record.[5]

After hearing the evidence, the court below continued the matter to permit each side to put in additional evidence and briefs, largely on the question of jurisdiction. Thereafter, the said court ordered judgment for the government. Appellant's counsel moved to set aside the submission of the case, to vacate the order for judgment and to re-open the case. This motion was granted. Voluminous additional testimony by deposition, and orally, was introduced by both sides. The court below thereafter re-submitted the case, and found against appellant by holding the government had established "by clear unequivocal and convincing evidence that the defendant under oath had stated he had no previous arrests," while in fact appellant had had "a prior criminal record."

The court further found with respect to the First Cause of Action, charging concealment, (a) that at the time he filed his petition for citizenship his name was Gdale Oistaczer, that he was known also as Joe or Joseph Rosen;[6] (b) that on September 16, 1929, he signed his preliminary form for Petition for Citizenship and certified the statements therein were true;

> "Said Preliminary Form contained the printed question:
>
> " '27. Have you ever been arrested or charged with violation of any law of the United States or state or any city ordinance or traffic violation?' And the answer in longhand was, 'No.', which answer was false, as the defendant well knew.";

(c) that on January 22, 1930, after being sworn to tell the truth, appellant, when asked by Naturalization Examiner Braden if he had ever been arrested or convicted of a crime, answered "no"; that Braden "made a notation in his own handwriting on the reverse side of the triplicate copy of the defendant's Petition for Citizenship * * * 'Arr: No' "; that appellant's said answer was false, as he well knew;[7] (d) that in the five years prior to appellant's petition, he had been arrested for or charged with the commission of a crime on eight occasions;[8] (e) that as a result of appellant's concealment of such material facts, the Immigration and Naturalization Service was prevented from making a full and proper investigation of appellant's qualifications for citizenship, and there resulted the Examiner's recommendation to the court that citizenship should be granted;[9] (f) that the necessary affidavit showing good and sufficient cause for the present action had been filed.[10]

Similar findings of fact, which amounted to wilful misrepresentation on appellant's part, were made to support the government's second cause of action.

The court below concluded that the appellant's naturalization was procured by concealment of material facts and by wilful misrepresentation and revoked his citizenship.

Appellant subsequently moved for a new trial and to revise the Findings of Fact and Conclusions of Law. These motions were denied and this appeal followed.

Thus the case was tried on two issues —was there jurisdiction over the appellant in this proceeding; and did appellant make false answers to the examiner's questions? The court below decided both issues in favor of the government. We will consider the two points.

---

5. This offer of proof became immaterial in view of the issues tried and the judgment rendered.

6. Finding III.

7. Finding VI.

8. Finding VII.

9. Finding VIII.

10. Finding IX.

I. *Jurisdiction in the District Court, Southern District of California, Over the Appellant.*

The government contended that appellant was a resident of California on February 2, 1953 (the controlling date), while appellant asserts he had been a resident of New Jersey for thirty-eight years prior to June, 1950, and of Nevada since June, 1950, up to and including February 2, 1953.

Section 340(a) of the Immigration and Nationality Act of 1952 provides that revocation proceedings shall be brought "in any court specified in subsection (a) of section 310 of this title, in the judicial district *in which the naturalized citizen may reside at the time of bringing suit.*" [Emphasis added.]

Section 310(a) vests "exclusive jurisdiction" to naturalize persons and provides that such jurisdiction "shall extend only to such persons *resident* within the respective jurisdiction of such courts." [Emphasis added.]

28 U.S.C. section 1391(b) provides:

"A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where *all defendants reside.*" [Emphasis added.]

■ We accept appellant's position that there is an essential difference between "domicile" which generally involves intent, and "residence" which generally involves an actual place of abode. With this position the government agrees. We are then, not concerned with "intent."

The court passed on this issue at least twice; first, by way of denying defendant's motion to quash, denied June 30, 1953, and a second time, at the trial after additional evidence had been presented on the issue.

■ In determining the issue of jurisdiction, we must first recognize that it is a question of fact, to be determined by the trial judge. Unlike the rule of law which governs us in the second phase of this case, here we are faced with the provisions of Rule 52(a), Federal Rules of Civil Procedure, which tell us that "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

Further, the government was the prevailing party below, and hence we must take that view of the evidence most favorable to it. Appellee is entitled to the benefit of all favorable inferences from the facts proved relative to the issue of residence. If, when so viewed, there was substantial evidence to sustain the findings, then the judgment may not be reversed by this Court unless against the clear weight of the evidence or unless influenced by an erroneous view of the law. Lewis Food Co. of California v. Milwaukee Ins. Co., 9 Cir., 1958, 257 F.2d 525; John Hancock Mut. Life Ins. Co. v. Cohen, 9 Cir., 1958, 254 F.2d 417; United States v. First Trust Co. of St. Paul, 8 Cir., 1958, 251 F.2d 686; Ellison v. Frank, 9 Cir., 1957, 245 F.2d 837; Vidales v. Brownell, 9 Cir., 1954, 217 F.2d 136.

■ While there was evidence in the record to support a finding of non-residence in California on February 2, 1953,[11] there was equal, and in our opin-

---

11. (a) Defendant, up to June 17, 1950, had resided in New Jersey. At that time he went to Reno, Nevada.

(b) In July, 1950, defendant purchased "an interest" costing roughly $91,000 in two corporations; the Bank Club of Reno, Inc. (50,000 shares) and Golden Securities Co. (250 shares).

(c) According to appellant's 1952 Income Tax Return, he sold these shares April 30, 1952. According to his tax attorney, one Burton, he sold his interest in the Golden Hotel (Golden Securities, Inc.) and the Bank Club of Reno in May, 1952. According to appellant's 1953 tax return, he sold the shares of the two corporations on April 30, 1953. The 1952 date is undoubtedly correct. Appellant received $86,000 cash, a one-third interest in the Earl Carroll Theatre Building in Hollywood, valued at $97,000, and "Installment Notes" of $1,166,000.

ion, a greater preponderance of substantial evidence in the record to support the finding of residence in California on that controlling date.[12] We will not

At any rate, "early in 1952" and on May 29, 1952, he moved to Las Vegas, although he frequently returned to Reno to collect on and watch his second and third purchase price mortgages on the hotel.

(d). While in Reno, he looked at houses to buy, but they "were too much money, and my wife wouldn't live there." Appellant lived at a Mr. Emmons' house, at the Golden Hotel, and at a Mr. High's house. He lived with High over a year, off and on.

(e) He had stayed at The Desert Inn in Las Vegas in May or June, 1951, and at various times prior to October 1952.

(f) He registered at The Desert Inn at Las Vegas on October 11, 1952. In evidence was his hotel bill, showing he remained in Room 132 from October 11th to 23rd; in Rooms 254–56 from October 24th to November 1st; in Room 254 from November 2nd to 15th; he was gone from November 16th to November 21st, inclusive; he stayed in Room 220 with Mrs. Stacher from November 22nd to November 28th; he was gone from November 29th to December 22nd, inclusive; he and Mrs. Stacher stayed in Rooms 106–8 from December 23rd to January 2, 1953; he was in Room 216 from January 3rd to January 20th; in Room 217 and 116–118 with Mrs. Stacher from January 20th to January 27th, 1953; and he was alone in Room 136 from January 27th to February 2nd, 1953.

(g) On February 2, 1953, he moved to El Rancho Vegas hotel, and was allegedly living there on March 28, 1953 (when he challenged the jurisdiction of this Court by affidavit) in a duplex bungalow he had leased for a year.

(h) In 1952 both Mr. and Mrs. Stacher had filed their 1951 Federal Income Tax Return listing the Golden Hotel, Reno, as their "home address."

(i) In 1953, their 1952 Federal Income Tax Return was filed, listing Hotel El Rancho Vegas, Las Vegas, as their "home address."

(j) In 1954, their 1953 Federal Income Tax Return was filed, listing Bungalow No. 505, Hotel El Rancho Vegas, Las Vegas, as their "home address."

(k) Mrs. Stacher visited Palm Springs in Southern California in 1952, and becoming pregnant and desiring the services of a certain obstetrician, temporarily rented a furnished house in Beverly Hills until the baby she was expecting was born. After the birth, she stayed until her teen-aged son could finish his school term. Appellant visited her at Palm Springs and Beverly Hills only occasionally.

12. (a) Appellant left Newark, New Jersey, in June of 1950. At that time he owned a home in South Orange, New Jersey, at 215 North Wyoming Avenue.

(b) His business interests were in New Jersey. In 1951 he received (1) $12,-775.00 as *wages* from Runyon Sales Co. of New Jersey, Inc., 123–125 Runyon Street, Newark 8, New Jersey; (2). $4,-375.00 as *wages* from Runyon Games Co., 123 W. Runyon St., Newark, New Jersey; (3) $1,500.00 as *wages* from Harlew Agency, Inc., 1028 Broad St., Newark, New Jersey; (4) $5,950.00 as *wages* from Runyon Sales Co. of New York, Inc., 593 10th Ave., New York 18, N. Y. He received lesser *wages* from one or more of these companies in 1952 and none in 1953.

(c) He did not sell his home in New Jersey until April 23, 1953—after this suit was filed.

(d) He moved to Reno, Nevada, in June of 1950, but had no fixed residence in Reno, moving about between Emmons' house, the Golden Hotel, and Mr. High's home.

(e) Mr. Stacher made no explanation of where he lived from May 1, 1952 to October 11, 1952, when he registered at The Desert Inn at Las Vegas.

(f) He registered there, giving his address as "55 Runyon St., Newark, New Jersey." This was the address on his hotel bill on February 2, 1953 when he was served. He stayed at a daily rate.

(g) It was only *after* such service that he moved to Hotel El Rancho Vegas, Las Vegas, Nevada, registered as from Reno, Nevada, and paid a daily rate until March 18, 1953, when he went on a monthly rate.

(h) Mrs. Stacher went from Reno to Palm Springs. She visited Mr. Stacher at The Desert Inn in Las Vegas for three one-week periods in 1952 (October 24—November 1st; November 22nd—28th; December 23rd—January 2nd) and one week in January, 1953 (January 20th—27th), but lived in California or visited in the East the remainder of the time.

(i) At Palm Springs, California, Mrs. Stacher leased a home at 478 Merito Place. Mr. Stacher did not sign the lease, but Mrs. Stacher signed for her

husband and herself. Stacher alone was listed as lessee, and his address was given as 215 North Wyoming Avenue, South Orange, New Jersey. The term of the lease was from November 20, 1951 to May 20, 1952.

(j) Stacher admitted he had made two visits to his wife in Palm Springs, California, although the dates were unknown to him. "I lived there a little while," he said. He spent two months in Palm Springs, six weeks at one time—six visits altogether. Mr. High testified he had spent "a few months" with appellant at Palm Springs.

(k) The Palm Springs City Directory for 1952 listed Joseph Stacher at 478 Merito Place as a resident. This listing was *not* made by Stacher personally.

(*l*) The Telephone Directory for Palm Springs showed a listing for Joseph Stacher at 478 Merito Place, which had been requested November 19, 1951. This application was not signed by either Mr. or Mrs. Stacher, but by a real estate agent.

The Stachers apparently operated two automobiles—a Cadillac and a Mercury Sedan.

(m) On May 7, 1952, the Mercury was sold by a Palm Springs dealer to Joseph Stacher of 478 Merito Place, and a license issued on May 20, 1952, based upon an application signed by Joseph Stacher under the statement:

"The undersigned hereby certifies all statements made either on the face of this application or the reverse side (h) hereof are true and correct to the best of his knowledge and belief."

Above this certificate, in answer to the *b*lank, "Business or Residence Address:" there appeared "478 Merito Place," and above that the notation: "Resident, county of ............," with "Riverside" inserted.

(n) On February 3, 1953, the 1953 registration was completed, showing the car registered to "Stacher, Joseph, 478 Merito Place, Palm Springs, California."

(o) Thereafter (and at a date subsequent to the disputed service), a change of residence to a new address, Hotel El Rancho Vegas, Las Vegas, was made.

(p) The Cadillac on March 14, 1952, was registered in the name of Miriam Stacher of 258 Goldsmith Avenue, Newark, New Jersey. On August 13, 1952, it was registered in California to:

"Name: Stacher, Miriam
Business or
Residence Address: 721 N. Beverly Dr., Beverly Hills, California." And above that, "Resident, County of ...... " with "Los Angeles" inserted.

(q) The 1953 registration for the Cadillac was originally issued to the same name and same Beverly Hills address.

(r) Appellant had a driver's license in New Jersey in 1951, and in California from 1952 to 1956.

(s) He never had a driver's license in Nevada.

(t) His California driver's license showed the Palm Springs address.

(u) The Beverly Hills address noted was that shown in Government's Exhibit 27, a lease signed April 10, 1952 covering the period May 15, 1952 to May 14, 1953, at the rate of $833.33 per month. The lessee is named as Joseph Stacher—both appellant and his wife signed it.

(v) On September 8, 1952, Mrs. Miriam Stacher entered the Cedars of Lebanon Hospital in Los Angeles for the birth of a child. The hospital records show her address to be 721 North Beverly Drive, Beverly Hills, California; nearest relative: Joseph Stacher; address: "same."

(w) Both Mrs. Stacher and appellant signed the consent to anesthesia required by the hospital.

(x) The telephone directory for Beverly Hills for February 1953, showed a listing to Joseph Stacher at 721 No. Beverly Drive, Beverly Hills.

(y) There was proof by affidavit that there was no telephone listing for Joseph Stacher in Las Vegas, Reno, Ely, Carson City, or Elko, Nevada, in 1952 or early 1953.

(z) On May 26, 1952 Joseph Stacher signed an application for domestic electric service with the Southern California Edison Company for the premises at "721 No. Beverly Drive, B.H." which had been applied for by mail on May 15, 1952. Not in appellant's handwriting, under the notation "additional information," appeared the following: "215 No. Wyoming Ave., South Orange, New Jersey, Tel. SO-2-4796."

(aa) Mr. Stacher stated he spent about two months of the year at Beverly Hills, four weeks at one time, although the time was not identified. (By inference, it may have been between May 15, 1952 and October 11, 1952.) Appellant signed the hospital records on September 8, 1952, and Dr. Krahulik, the obstetrician, assertedly saw the defendant "in his Beverly Hills home" about a week after September 14, 1952.

(bb) Mrs. Stacher opened a bank account in Beverly Hills on November 11, 1952, which remained active into 1953.

and cannot, under such circumstances and upon such a record, reverse the ruling of the trial court.

## II. *The Concealment and Misrepresentation.*

Appellant made no attempt to deny seven of the eight arrests found as hereinbefore set forth, or to deny his failure to disclose them in the course of his naturalization proceedings. His defense did not urge that inaccurate information had not been given the government, but that he was not responsible for the government having received such inaccurate information. Defendant maintained that no oral question was asked him concerning his arrest record; that the written answers were made on his behalf either by his sister or his friend, Mr. Kemeny, now deceased; and that these should not bind him in this type of proceeding. The issue of his good moral character or the lack of it was not passed upon by the court below, although it was stipulated, subject to appellant's objection as to competency, that appellant appeared as a witness pursuant to a subpoena served upon him before the United States Special Committee to Investigate Organized Crime in Interstate Commerce, Senator Tobey presiding, and testified under oath on July 11, 1951, at Newark, New Jersey, and gave certain testimony which apparently raised serious questions as to his moral character and triggered an investigation into his citizenship and the institution of these proceedings.

The right of citizenship created by the Constitution is today more than ever a "priceless right," [13] protected by the courts. As created by the Constitution that citizenship, so protected, applies both to those born in, and to those naturalized by, the United States.[14]

> "[The naturalized citizen] becomes a member of the society, possessing all the rights of a native citizen, and standing, in the view of the Constitution, on the footing of a native. The Constitution does not authorize Congress to enlarge or abridge those rights. The simple power of the national Legislature, is to prescribe a uniform rule of naturalization, and the exercise of this power exhausts it, so far as respects the individual." [15]

Thus, the status of the naturalized citizen is comparatively secure. But that citizenship may be voluntarily relinquished,[16] and the citizenship acquired

(cc) The teen-age minor son opened a bank account in Beverly Hills on July 14, 1952. He attended Black Foxe Military Academy in Los Angeles from September 15, 1952 to June 12, 1953.

(dd) Mr. Stacher voted in New Jersey, but not in California or Nevada.

(ee) Appellant's only business in Reno, Nevada, after April 20, 1953 was seeing to payments on his "big second mortgage" on the Golden Hotel.

(ff) Appellant had no business in Las Vegas in 1953, has had none there, and had none there at the time of trial. He had no business anywhere at time of trial, but owned the second mortgage on the Golden Hotel in Reno and a third part of the Earl Carroll Theatre in Los Angeles, known as The Moulin Rouge.

(gg) In 1952 the State of New York started extradition proceedings against appellant to extradite him from Nevada. Nevada refused extradition on January 19, 1953. The United States Supreme Court granted certiorari on June 15, 1953, and reversed the refusal to extradite on December 7, 1953. Appellant then went to New York and settled the charges against him.

(hh) Mr. Stacher lived in Las Vegas, Nevada, until April of 1954 when he moved to Beverly Hills, California, where he lived and made his residence at the time of trial.

13. Warren, C. J., dissenting in Perez v. Brownell, 1958, 356 U.S. 44, 78, 78 S. Ct. 568, 2 L.Ed.2d 603.

14. "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S.Const., Amend. XIV, § 1, ch. 1.

15. Osborn v. Bank of United States, 1824, 9 Wheat. 737, 22 U.S. 737, 825, 6 L.Ed. 204.

16. Act of July 27, 1868, 15 Stat. 223.* Nishikawa v. Dulles, 1958, 356 U.S. 129,

* Now 8 U.S.C.A. § 1482.

by naturalization that is so carefully protected by our courts is only that which has been *lawfully* acquired. Naturalization unlawfully procured can be set aside.[17] But in proceedings to set aside naturalization, although the proceedings are not criminal in their nature, the burden is on the government to prove the unlawfulness by clear, convincing, and unequivocal proof,[18] which does not "leave the issue in doubt." [19]

■ It is the duty of this Court, as an appellate tribunal, to examine the government's evidence to ascertain whether it meets this high standard of proof.[20] Unlike the usual case, the Supreme Court does "not accept even the concurrent findings of two lower courts as conclusive." [21] Nor can we here accept the finding of the one lower court as conclusive. We must come to our own conclusion as to the facts. But neither are we to assume, because the burden on the government is heavy in cases of this type (as the Supreme Court has pointed out), that we are required, or that the Supreme Court has intended, that we should, in the language of the trial court, "nullify Section 340 of the Nationality Act and permit an alien, by the concealment of material facts from the naturalization examiner, to obtain priceless citizenship."

We turn to the evidence on concealment and misrepresentation. We have read with care the voluminous record (1,030 pages) and examined some two score exhibits in evidence and a like number identified but not introduced. We have considered the difficulties inherent in proving in 1956 what happened in 1930, including the absence of certain witnesses. We have considered Stacher's version, and the testimony of the examiner, Braden, given on direct and under vigorous cross-examination, both at the trial (November 29, 1955) and by four depositions, two before trial (August 3, 1954, and October 19, 1955) and two after part of the case had been tried (June 11, 1956, and July 23, 1956). We have considered the testimony and other evidence offered by each side in corroboration or impeachment of the other's case. As instructed by the Supreme Court, "we have considered the appraisal of the veracity of the witnesses by the judge who saw and heard them and have given it that 'due regard' required by the Federal Rules of Civil Procedure, rule 52(a)." [22] We have examined and reexamined certain of the documentary evidence in the case; and particularly, the Government's Exhibit 4 (the triplicate Form A-2214), denominated "Application for A Certificate of Arrival and Preliminary Form for Petition for Citizenship, U. S. Dept. of Labor, Naturalization Service," dated September 16, 1929. There were various marks on this document including check marks. These were markings in pencil and in ink on pages 1, 2 and 3. The witness Braden very carefully and precisely told the trial court which marks and what language he knew and recognized, and the marks and the language he did not recognize. Braden was not a partisan witness—he did not take sides. He didn't remember Stacher as an individ--

78 S.Ct. 612, 2 L.Ed.2d 659; Mandoli v. Acheson, 1952, 344 U.S. 133, 73 S.Ct. 135, 97 L.Ed. 146. This voluntary relinquishment applies to citizens by birth as well as naturalized citizens. Mackenzie v. Hare, 1915, 239 U.S. 299, 36 S.Ct. 106, 60 L.Ed. 297.

17. Knauer v. United States, 1945, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500; Baumgartner v. United States, 1944, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525; Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796.

18. Baumgartner v. United States, supra note 17; Schneiderman v. United States, supra note 17.

19. Klapprott v. United States, 1949, 335 U.S. 601, 612, 69 S.Ct. 384, 389, 93 L. Ed. 266; Knauer v. United States, supra note 17.

20. Brenci v. United States, 1 Cir., 1949, 175 F.2d 90, 92.

21. Knauer v. United States, supra note 17, 328 U.S. at page 657, 66 S.Ct. at page 1306.

22. Id., 328 U.S. at page 660, 66 S.Ct. at page 1308.

ual applicant, nor his answers. He did not know whether or not Stacher filled in the blanks, or even whether or not he signed his name. But he did positively and emphatically know that on page 3, the "Statement of Facts to be used in filing my Petition for Citizenship," he (Braden) (1) had put sixteen various check marks on that page 3 in blue pencil; (2) had written the word "Hebrew" over the word "white" after the question: "My race"; (3) had written the word "not" before "married" at question 5; (4) had added the word "not" in line 10; (5) had written the full first name "Joseph" before the word "Stacher"; (6) had put his own shorthand symbols "Cit OK" and "14 y." (meaning Handler was a citizen and had known the applicant fourteen years) opposite the name "Harry Handler," one of appellant's witnesses; (7) had crossed out "business salesman" and written in "garageman"; (8) had crossed out a witness' name; (9) had written in the name of the substitute witness, "Emil Kemeny, Interpreter, 299 Clinton Ave., Newark;" and (10) had written over Kemeny's name "Cit. OK" and "10 yr."

On page two of this Exhibit 4, question 27 reads:

"Have you ever been arrested *or* charged with violation of *any* law of the United States *or* State *or* any city ordinance or traffic regulation?
. . . . . . . . . . . . . . . . . . . . . . . . . . . .
If so, give full particulars. . . . . . ."
[Emphasis added.]

To the first question, the answer "No" was written in.

In addition to the foregoing, a document was in evidence (Government Ex. 7) captioned on page 1 "Petition for Citizenship" of Gdale Oistaczer (Joe Stacher), and on page 2 "In the matter of the Petition of Gdale Oistaczer to be admitted as a citizen of the United States of America—Affidavit of Witnesses"

(Harry Handler and Emil Kemeny). On the triplicate copy of the typewritten petition, everything shown in handwriting was in the handwriting of Braden, to-wit: (11) the date "1-22-30"; (12) the "G" indicating the recommendation to the court that citizenship should be granted; (13) "W.E." indicating the witnesses were excused; (14) "B" being the Examiner, Braden's initial; (15) "May 12, 1930," the final hearing date (stamped in by rubber stamp); (16) "F.W.B.," the examiner's initials (stamped in by rubber stamp).

Thus the records established beyond doubt that Braden had acted as both the "designated examiner" on January 22, 1930, and "naturalization examiner" on May 12, 1930.

Under "Result of Examination" Braden *wrote* and *initialed* on May 12, 1930: (17) "Abs: No" to an alleged inquiry whether the applicant had been absent from the United States; (18) "Arr: No" to the alleged inquiry whether applicant had ever been arrested or convicted of a crime; (19) "Read: O.K." to the alleged test on whether applicant was able to read simple English; (20) "Eng: O.K." to indicate the applicant's understanding of the language and the examiner's ability to understand applicant's expression of it; (21) "Govt.: Fair" to indicate a fair knowledge of the form of government organization in this country. This witness then added: "Change name—Joseph Stacher." [23]

In contrast to the weight, as evidence, of this contemporaneously made memorandum of what happened in 1930, kept as part of the records of the Naturalization Service for a quarter of a century, and made by a person (now retired from Government service) in the regular performance of his designated duties (and interested only to the extent of insisting he had carefully and adequately performed those duties), stands the testimony of the applicant that he signed

---

23. For an example of the weight such entries *may* carry, in a similar denaturalization case, see: Corrado v. United States, 6 Cir., 1955, 227 F.2d 780, 782, certiorari denied 351 U.S. 925, 76 S.Ct. 781, 100 L.Ed. 1455.

the application for citizenship, but *did not read it;* that Mr. Braden *did not ask him* if he had ever been arrested or convicted of any crime, or ever absent from the United States, or if he understood the principles of the organization of the government of the United States. Both Kemeny and Handler, appellant's two witnesses to his naturalization, had died before the trial. Kemeny died subsequent to September 1954 and in approximately October of 1955 after this case filed against appellant had been pending over two years.

Appellant produced in support of his unusual story (a) the testimony by deposition of his two sisters, one of whom states she answered the question respecting arrests; (b) the testimony of a retired County Detective, Louis Sklarey, to the effect that Stacher signed the application without reading it; (c) the testimony of Mrs. Kemeny, which added little; and, (d) the depositions of Julius Berger, George Golub, Morris Diamond and Joseph Friedlander, naturalized citizens examined by Braden, and Herman Isenberg, Julius Cassell, Morrie Seigle, Leo Bateman, witnesses in naturalization proceedings wherein Braden had been examiner. None of these witnesses knew anything about Joseph Stacher's naturalization. Their testimony was apparently offered in rebuttal to Braden's testimony as to his "invariable practice" of asking each applicant about any arrests. If Braden's testimony had rested entirely upon an "invariable practice," and there had not been written evidence that practice had been followed in this case, some of the testimony of these eight witnesses would have been of value to appellant's case. But Braden's testimony as to what was his invariable practice was backed up in this instance by written proof of what he had noted, and done, on the specific occasions here involved.

Furthermore, the testimony of these eight witnesses only in part supported rebuttal. It varied from Herman Isenberg's and Leo Bateman's and George Golub's positive statements that no questions were asked concerning arrests, to Diamond's and Berger's and Seigle's uncertainty, and Friedlander's and Cassell's positive recollection of such questioning by Braden relative to arrests.

We need not discuss here the impression on the trial judge, which may or may not have been made, of a lack of complete candor in appellant's testimony. A witness usually has no difficulty, for example, in recognizing his own and/or his wife's legible signature made in connection with a $10,000 transaction occurring within the previous five years.[24]

24. For example, appellant, as a witness, was questioned on cross-examination concerning the lease on the Beverly Hills house. The following colloquy took place:

"Q. (By the government): Mr. Stacher, I show you Government's Exhibit 27 for identification * * * and ask you if the name 'Joseph Stacher' written in ink at the bottom of that exhibit is your signature? A. This is Miriam and this is Joseph Stacher.

"Q. Two signatures. One is Miriam Stacher and the other is Joseph Stacher. Now, I am asking you if the signature 'Joseph Stacher' was put on there by you? A. Miss Martin, I don't know—I can't really say. I am here to testify to the best of my ability, yes. You showed me a lease which was made out by one of your investigators and you asked me if I signed it and it was 'Miriam Stacher and Joseph Stacher' on there and I didn't sign it. I didn't know—I don't know now whether I signed it or not. I can't be sure, Miss Martin.

"Q. You can't recognize your own signature? A. I didn't say that Miss Martin.

"Q. Can you recognize your own signature? A. I can recognize—I am not sure that this is my signature or Mrs. Stacher's signature.

"Q. I am only asking you at this moment if the writing 'Joseph Stacher' is your signature. A. I am not positive. I am not sure. It might be my signature.

"Q. Do you recall whether or not you were present at the signing of the lease for the Beverly Hills home? A. I don't remember, Miss Martin.

\* \* \* \* \* \* \*

"Q. Do you know whether or not the signature in ink on this document 'Miri-

This was a matter peculiarly and particularly for the trial judge to pass upon and to weigh it as he willed.

We conclude that the evidence is clear, unequivocal and convincing—evidence that does not leave the issue in doubt—that false answers were given by Stacher, and on his behalf and in his presence, to the naturalization examiner, and that Stacher received his naturalization certificate illegally.[25]

### III. *Other Errors Urged.*

The foregoing consideration of jurisdiction and the evidence to support misrepresentation and concealment covers appellant's points two, three and most of five.

Alleged error number one attacks the constitutionality of Section 340(a) of the Nationality Act of 1952. The premise of this allegation is that § 340(a), in permitting judicial revocation of naturalization for "concealment of a material fact or wilful misrepresentation," changes the former basis for revocation contained in § 15 of the Nationality Act of 1906 (34 Stat. 601; 8 U.S.C. (1940 ed.) § 405**), under which appellant was naturalized, which provided for revocation "on the ground of fraud or on the ground that such certificate (of naturalization) was illegally procured."

"Fraud connotes perjury, falsification, concealment, misrepresentation." Knauer v. United States, 1946, 328 U.S. 654, 657, 66 S.Ct. 1304, 1306, 90 L.Ed. 1500. Under the prior provision, misrepresentation or concealment, with the requisite wilfulness or materiality, was sufficient to constitute fraud;[26] we are therefore satisfied as to the constitutionality of Section 340(a) as applied to appellant.

Alleged error four relates to objections to the introduction of evidence. We are satisfied no prejudicial error existed. Several exhibits attacked were not im-

am Stacher' is the signature of your wife? A. I can't be sure, Miss Martin. This means an awful lot to me, my citizenship papers, Miss Martin, and I want to be sure.

"Q. Do you know whether or not your wife signed the lease for the Beverly Hills house? A. I don't know, Miss Martin.

\* \* \* \* \* \* \*

"Q. Did you ever have any conversation with her in regard to it? A. The house?

"Q. To the signing of the lease. A. No, I don't think so, Miss Martin.

\* \* \* \* \* \* \*

"Q. Did she ever tell you she signed a lease for the house? A. I don't remember, Miss Martin." [Tr. 688–690.]

25. "Upon analysis, the issue is not whether naturalization would have been denied appellant, had he revealed his numerous arrests, but whether, by his false answers, the Government was denied the opportunity of investigating the moral character of appellant and the facts relating to his eligibility for citizenship. How could any Government official or witness say whether or not citizenship would have been denied appellant from an investigation of the various causes of his arrest, when no opportunity for investigation was afforded? His false statement upon the material matter in actuality caused no investigation to be made. To be awarded citizenship in the United States exacts the highest standard of rectitude. Our Government should be afforded full opportunity for investigation of the moral character and fitness of an alien who seeks to be vested with all the rights, privileges and immunities of a natural born citizen of the United States. Where fraud has been practiced by the alien in procuring citizenship, it is not required that the Government in a denaturalization proceeding should meet the standard necessary for conviction in a criminal case. It will suffice to show that the applicant lied concerning a material fact which, if revealed, might have prevented his acquisition of citizenship." Corrado v. United States, supra, note 23, 227 F.2d at page 784.

** Now 8 U.S.C.A. § 1451.

26. Knauer v. United States, supra note 17; Johannessen v. United States, 1912, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066; United States v. Montalbano, 3 Cir., 1956, 236 F.2d 757, certiorari denied Genovese v. U. S., 352 U.S. 952, 77 S.Ct. 327, 1 L.Ed.2d 244; Corrado v. United States, supra note 23; Brenci v. United States, supra note 20; United States v. Jerome, D.C.S.D.N.Y.1953, 115 F.Supp. 818; cf. Luria v. United States, 1913, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101.

peaching or binding on defendant, but were admissible to show the *fact* of a lease, a telephone listing or a second lease, for whatever weight proof of such facts might have. Exhibit 27 (the original) cured any error relative to Exhibit 23 (copy of the lease) because Stacher *did* sign Exhibit 27. The weight and value of the other exhibits was subject to argument, but this did not make them inadmissible. The trial court repeatedly and carefully recognized this, and we find no error that was prejudicial, either in the introduction of evidence or in other rulings made by the lower court. An extended discussion of such alleged errors would not be helpful.

The judgment is affirmed.