Richard Douglas FURNISH and Emilie
Furnish Funk, Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 15942.

United States Court of Appeals
Ninth Circuit.

Dec. 22, 1958.

Murray M. Chotiner, Beverly Hills, Cal., Dermot R. Long, Hollywood, Cal., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Grant W. Wiprud, Lee A. Jackson, A. F. Prescott, Joseph Kovner, Attys., Department of Justice, Washington, D. C., for respondent.

Before BARNES, HAMLEY and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

Before us are separate appeals by Richard Douglas Furnish and Emilie Furnish Funk, his onetime wife. Richard Douglas Furnish appeals from determinations of deficiencies of income tax for the years 1939 to 1949; his former wife for the period 1939 to 1942. Mrs. Funk's responsibility rests on her alleged joint and several liability for the filing of joint returns found to have been fraudulent. Mrs. Funk had actually signed such income tax forms, while blank, at her husband's request.

*I—Dr. Furnish's Appeal*

Richard Douglas Furnish, a doctor of medicine practicing in California, filed income tax returns for the years 1939 to 1948 reporting net income of $101,407.88 for these years. In the court below, he admits that he received a net income of $529,854.84 during these years, computed by his accountant through use of the net worth method. The figures established originally by an audit of taxpayer's books, prepared by an auditor of taxpayer's choice—the so-called Hill Audit—and as revised and checked by the Commissioner, enabled him to find, and he did find, that the doctor's net income during this period was $649,512.73. The Tax Court found the Commissioner's method of determining the taxpayer's net income (*i. e.*, from the doctor's professional books and receipts, dividends, interest, and gain from sale of properties) was more accurate than the net worth method.

Errors urged are (1) that the so-called Hill Audit (Petitioner's Ex. 1) was received in evidence in error; (2) that its figures were not as accurate as those derived by the net worth method, advocated and relied on by the petitioner; (3) that respondent had not sustained his burden of proof of establishing fraud; and (4) that because of the absence of fraud, the statute of limitations bars deficiencies prior to 1944.

The deficiencies in question cover eleven successive calendar years—from 1939 through 1949. No point is raised on this appeal with respect to the deficiency determination for 1949. A total gross understatement of the difference between $100,000 and $530,000 (in round figures) is *admitted* by the taxpayer. Some substantial portion of that difference is admitted as to each year. Thus the *incorrectness* of the returns is without dispute. Mere omission of reportable income is not of itself sufficient to warrant a finding of fraud in an income tax case. Bryan v. Commissioner, 5 Cir., 1954, 209 F.2d 822; Goldberg v. Commissioner, 5 Cir., 1956, 239 F.2d 316, 320. However, repeated understate-

ments in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud. Anderson v. Commissioner, 5 Cir., 1957, 250 F.2d 242, 249–250. Some of the taxpayer's income was reported by individuals other than petitioner.[1] Title to real and personal property owned by the taxpayer was held in names other than the taxpayer.[2] Petitioner failed to include certain substantial amounts of income on his books. "There was evidence of a consistent pattern of under reporting large amounts of income, and of the failure on petitioner's part to include all of (his) income in (his) books and records. * * * " These acts alone are sufficient to support an inference of wilfulness, says the Supreme Court in Holland v. United States, 1954, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150; Spies v. United States, 1943, 317 U.S. 492, 499–500, 63 S.Ct. 364, 87 L.Ed. 418.

The taxpayer not only did not keep accurate records, but he refused to follow the advice of others suggesting that he keep them.

■ The taxpayer concealed his ownership of certain property. He explained this as being a matter of convenience due to law suits and difficulties with his wife. Yet such concealment by itself is indicative of a wilful intent to evade income taxes. Remmer v. United States, 9 Cir., 1953, 205 F.2d 277, 288. Further, neither by testimony, brief, nor in oral argument has petitioner explained why he sent checks received from patients which represented payment of his (the taxpayer's) bills for medical services rendered in Los Angeles County, California, to his sister in Kansas City. There they were cashed and stored in a safe deposit box. "Approximately $25,000" was returned to him from his sister in cash by express in 1946, and "approximately $25,000" additionally was sent to Dr. Furnish in cash in 1947. No record was kept by anyone as to these transactions.

Again, the suggestion of "convenience" is raised by taxpayer explaining why he had a friend cash a $65,000 check made out to someone else, in San Pedro, so that he (Dr. Furnish) might receive the money in $20 bills. Such a transaction, when viewed in the light of all other evidence in the case, leads more readily to a conclusion of intent to defraud the government than that it was a matter of mere convenience.

No explanation is offered as to why Dr. Furnish denied to government auditors that he had previously owned any real estate, or had had any transactions therein, when the opposite was true.

Dr. Furnish did not choose to take the stand in his own behalf in this case. He introduced evidence on his own behalf, however, that he had previously entered a plea of nolo contendere to two of three counts in a criminal indictment charging the fraudulent evasion of income tax. After such conviction, the third count against Dr. Furnish was dismissed. At the time of his sentence, leniency was urged on his behalf by his counsel because "the doctor still must face the matter of fraud penalties—a fifty per

---

1. At least five individuals so reported, all with incomes less than the petitioners. For example, on the sale of the Florence and Crenshaw property, held and returned as capital gain realized by nominee Charles T. Scanlan and his wife, $1,767.08 was returned as the tax on capital gain. Had Dr. Furnish made a return including this item in 1948, the tax would have been $5,667.83 on a gain of $22,671.30.

Similarly, the sale in 1948 of real property located at 401 Vermont Avenue, showed a tax on nominee Elodia Sullivan of $16,860.95. The tax, had Dr. Furnish included it in his return, was $20,000 on the $80,000 gain. [Respondent's Ex. U.]

2. E. g., two bank accounts in the names of two individuals; seven parcels of real estate in the names of five more different individuals; corporate stock in the names of three individuals whose names had been used.

cent penalty payment of tax, and the payment of interest."

In view of the uncontradicted testimony of the petitioner's actions during this ten year period from 1939 to 1948, there can be no question but that the government sustained its burden of proof of establishing fraud by clear and convincing proof. The claim that no fraud was established is utterly unconvincing, and approaches the frivolous.

■ Petitioner Richard Douglas Furnish raises two other points that can be considered together—error in admitting the Hill Audit, and that the Hill Audit was not as good or as accurate a method of establishing income as was the net worth method, which in the manner presented by petitioner was more favorable to him.

It should be noted that the correct amount of taxpayer's income for each of the years in question from sources other than gross professional income is not in question. This covers interest, dividends and capital gains on real estate transactions. Further, the amount of petitioner's professional expenses is undisputed, since the Commission allowed all claimed by the taxpayer. Thus in reality the sole remaining issue is whether the determination made by the Tax Court of what constituted petitioner's *gross professional receipts* is supported by the evidence.

We first note that the audit upon which the Tax Court and the Commissioner below relied was prepared by Harry K. Hill, a Certified Public Accountant. He was acting at the direction of taxpayer who subsequently through his duly authorized attorney turned the audit over to the government. The audit was an extensive one based upon the accountant's complete examination of all the patient record cards in taxpayer's office, aided by consultation with taxpayer's two assistants who were familiar with the records and with taxpayer himself. Taxpayer is precluded from attacking the determination based on his own audit. Anderson v. Com-

missioner, supra, 250 F.2d at page 248. On ordinary rules of evidence, this admission alone is sufficient to support a finding by the trier of the facts that his income was as so stated. 4 Wigmore, Evidence § 1078 (3d ed. 1940). But, further, the government's representative checked the figures in the Hill Audit. Respondent points out that:

"Agent Ness carefully checked it, sampling 3,900 of the 20,000 cards. The special agent also consulted with the taxpayer's two office employees who were familiar with the records; and whenever they could not answer any question on a particular card, the special agent took it up with the taxpayer himself.

"As the special agent testified:

"'* * * we consulted freely with Rose Saunders and Irma Wheeler in the office, and with Dr. Furnish when he was available, and when these questions arose at that time, we consulted with whoever was available and we determined what that card reflected.'

"The agent's ampling disclosed some discrepancies between the audit as made by taxpayer's accountant and the records, but these discrepancies were generally in favor of the taxpayer and were accepted unchanged by the Commissioner." [Respondent's brief, pp. 24–25.]

As the government brief well says:

"Only once source of income is in dispute, namely his gross professional receipts, but these have been established from his own records, by his own accountant, aided by the taxpayer himself and his own employees. In short, this case is one in which the Commissioner has determined the taxpayer's income to be what he said it was."

We know of no rule of law or evidence that *requires* the Tax Court to accept as the best evidence a reconstructed net worth system in which the starting figures of opening cash were supplied and

based *solely* on the taxpayer's statement,[3] in preference to an audit made entirely from the records as they were maintained by the taxpayer.

The opening cash position is the one most critical figure. Holland v. United States, supra; Friedberg v. United States, 1954, 348 U.S. 142, 75 S.Ct. 138, 99 L.Ed. 188. Here, as the government has pointed out, it was stated as a fact by appellant but was not made under oath, not subject to cross-examination, and uncorroborated by any cash records of bank accounts, or books of account. It is a self-serving statement at best, and it certainly cannot rebut the evidence of income shown by an audit of taxpayer's records, aided by those familiar with the records, including taxpayer himself. Smith v. United States, 1954, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192.

The Commissioner did not accept the net worth statement as an accurate statement of the taxpayer's assets, as taxpayer asserts. On the contrary, as Agent Ness testified, had the Government intended to rely upon the net worth statement, it would have made a "close inquiry on the cash figures." Plainly, the Commissioner cannot be compelled to accept a net worth analysis. As a matter of law and reason he is authorized to determine taxpayer's income from his records, rather than from his unsworn assertions. Miller v. Commissioner, 5 Cir., 1956, 237 F.2d 830.

We conclude there is no merit in any of the grounds urged for reversal on behalf of Dr. Furnish.

## II—Mrs. Funk's Appeal

Here we have an entirely different situation than that presented by Dr. Furnish's appeal. Her appeal has reference to the years 1939 to 1942, inclusive, wherein joint returns were filed by the doctor and his then wife (now Mrs. Funk). As was stated above, Mrs. Funk signed these returns in blank, and the doctor filled them in.

Under Section 51(b) of the 1939 Code, 26 U.S.C.A. § 51(b), if a joint return is filed by a husband and wife living together, they are jointly and severally liable for the full tax liability. Such liability covers not only the basic tax but also any addition to the tax on account of fraud, notwithstanding that the wife may have signed the return in blank and that she was innocent of the fraud; indeed such liability extends to the wife with respect to a joint return even where she failed to sign it, provided that it was intended to be a joint return. Kann v. Commissioner, 1952, 18 T.C. 1032, 1044, affirmed, 3 Cir., 1953, 210 F.2d 247, certiorari denied, 1954, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1109; Howell v. Commissioner, 1948, 10 T.C. 859, 866, 869, affirmed, 6 Cir., 1949, 175 F.2d 240. Cf., Heim v. Commissioner, 1956, 27 T.C. 270.

Mrs. Funk raised the defense of duress in the Tax Court. The Tax Court found there was no merit in this defense because there existed no sufficient evidence that her free will was destroyed.[4]

3. "Q. But your beginning cash figure was wholly from Dr. Furnish? A. Wholly." [Tr. 249.]

4. "A signature made under duress is considered an involuntary act which may be viewed as never having occurred. She asks us to find that she signed the returns in blank because she was 'in fear of violence if she refused.' The principal evidence before us in that connection is the following testimony given by her in response to questions asked by her attorney:
"Q. Mrs. Funk, you testified that you did sign these returns in blank? A. I did.

"Q. Now, can you explain the circumstances surrounding that signing of the return in blank? How did it happen and where was it, at home, in the office, or how? A. It was at home. The Doctor never got home before about 2:00 a.m., and he would come in with his forms and say, 'Oh, I have to make these out tonight and it will take me most of the night. Just sign here and go up to bed.'
"Q. Did he say it in a nice way or in a harsh manner? A. Well, most of the time he was very harsh.
"Q. Then you would sign the return and go up to bed, is that correct? A. Yes, sir.

The Tax Court judge then said:

"We reach this conclusion with great reluctance, because it is plain upon this record not only that the wife was not guilty of fraud but that she, along with the Government, was a victim of the very fraud that has tolled the running of the statute of limitations against her and furnished the basis for the imposition of the so-called fraud penalty. The result is highly inequitable, but it appears to be required by the plain language of Section 51(b) and the cases applying it. To reach a contrary result with respect to her we would have to find that the returns were not in fact joint returns—a finding that cannot fairly be made on this record. The Congress has not committed to this Court the powers of a court of equity."

We agree with the Commissioner that after the decision in Cole v. Commissioner, 9 Cir., 1935, 81 F.2d 485, Congress in § 51(b) of the Revenue Act of 1938, ch. 289, 52 Stat. 447, 476, changed the language of the section to expressly provide that the liability of the joint signers shall be joint and several; and that such language was re-enacted into § 51(b) of the 1939 Code, controlling here. Under that law, as the House Committee Report

states,[5] "deficiencies, penalties and interest may be collected from either or both of them" (the joint signers).

■ We further agree with the Commissioner that the cases decided since the revision of § 51(b) hold that said section makes no distinction as to the liability of the signers based upon whether the transactions are fraudulent or non-fraudulent. The fact that the wife does not participate or even known of the husband's fraud does not exempt her from the civil penalties, including the penalty for fraud.

But Mrs. Funk does not seek "to draw a line based on the degree of the wife's knowledge or lack of knowledge of her husband's fraud, or her benefits therefrom," as the Commissioner contends she does. She urges that she signed the returns under duress. This defense is dismissed by the Tax Court with the citation of one case and the statement:

"We cannot find on this record that the 'incidents' which caused her to be 'afraid' of her husband were of such character as to produce a state of mind that would prevent the exercise of her free will. Fear that would justify a decision that a signature on a return was made in circumstances which destroyed the free will of the signer must have a

"Q. Mrs. Funk, did you sign these returns in blank because you were afraid of Dr. Furnish? A. Yes, sir, I was.
"Q. Had there been some prior difficulties in your marriage which made that fear reasonable? A. There certainly were.
"Q. Many incidents? A. Many.
"This testimony does not establish that she signed each or any one of the four returns under duress. It is not enough for her to say in general terms in response to leading questions that she was 'afraid' of petitioner and that 'many incidents' had occurred in her marriage that made this fear reasonable. She may or may not have been reluctant to sign these returns, but we think she has hardly established by such general testimony that she acted under duress or that her acts of signing were not of her own free will. We cannot find on this record that the 'incidents' which caused her to be

'afraid' of her husband were of such character as to produce a state of mind that would prevent the exercise of her free will. Fear that would justify a decision that a signature on a return was made in circumstances which destroyed the free will of the signer must have a sound basis in fact, and that basis must be shown. It has not been shown here. Cf. Estate of Merlin H. Aylesworth, 24 T.C. 134. We hold, therefore, that the returns filed for the years 1939 to 1942, inclusive, were joint returns of petitioners, and that each of them is jointly and severally liable for the deficiencies and additions to tax for fraud determined by the respondent for those years." [Tr. pp. 108–109.]

5. Report of a Subcommittee of the Commission on Ways and Means, 75th Cong. 3rd Sess. (House Hearing, Revision of Revenue Laws, 1938, pp. 57–58.)

sound basis in fact, and that basis must be shown. It has not been shown here. Cf. Estate of Merlin H. Aylesworth, 24 T.C. 134."

The government, in its brief, does not comment on the validity of the defense of duress to the liability created by § 51 (b) but argues only the existence of that liability.

It should be noted that the Aylesworth case, while apposite in certain particulars, did not involve civil fraud penalties, but merely deficiencies created by certain disallowed deductions and the classification of a claimed long term loss on the sale of securities as personal income. There, the wife had benefited from the returns she signed in blank.

■■ "Duress" may exist not only when a gun is held to one's head while a signature is being subscribed to a document. A long continued course of mental intimidation can be equally as effective, and perhaps more so, in constituting duress.[6] The actions of the husband in this particular case over a long period of time with all the other facts before the Court, lead us to the conclusion that here there could well have existed duress on the wife sufficient to destroy her free will. Under California law, the test of duress at its harshest is what would have influenced the conduct of a reasonable man. Young v. Hoagland, 1931, 212 Cal. 426, 431, 298 P. 996, 75 A.L.R. 654. Many courts have relaxed the rule to make the test the state of mind induced in the particular person. Steffen v. Refrigeration Discount Corp., 1949, 91 Cal. App.2d 494, 205 P.2d 727. Cf., Lewis v. Fahn, 1952, 113 Cal.App.2d 95, 247 P.2d 831, 833–834; 17A Am.Jur., Duress §§ 2, 4, 9, 11, 15 (1957).

"Under the modern doctrine there is no standard of courage or firmness with which the victim of duress must comply at the risk of being without remedy; the question is merely whether the pressure applied did in fact so far affect the individual concerned as to deprive him of contractual volition; if it did there is duress, if it did not there is none."

17 C.J.S. Contracts § 175.

Here Mrs. Funk was defrauded by her then husband, who was at the same time defrauding the government. She may have signed as an automaton; there could well have been no exercise of her free will. Under the peculiar circumstances of this case, we believe it harshly inequitable for the wife to be forced to pay a penalty for fraud arising out of nothing she had done, save signing a blank return required of her by a dominating husband who was attempting to defraud both his wife and his government.

■ We agree with appellant Emilie Furnish Funk that the Tax Court here holds liable "an innocent party for the fraudulent activities of a former spouse, when in fact said innocent party had no knowledge of, had not concurred in, nor

---

6. In Brown v. Pierce, 1868, 7 Wall. 205, 74 U.S. 205, at page 214, 19 L.Ed. 134, the Court says:

"Argument to show that a deed or other written obligation or contract, procured by means of duress, is inoperative and void, is hardly required, as the proposition, is not denied by the respondent. Actual violence is not necessary to constitute duress, even at common law, as understood in the parent country, because consent is the very essence of a contract, and, if there be compulsion, there is no actual consent, and moral compulsion, such as that produced by threats to take life or to inflict great bodily harm, as well as that produced by imprisonment, is everywhere regarded as sufficient, in law, to destroy free agency, without which there can be no contract, because, in that state of the case, there is not consent.

"Duress, in its more extended sense, means that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient, in severity or in apprehension, to overcome the mind and will of a person of ordinary firmness."

Cf. also, Davis v. Davis, 1942, 49 Cal. App.2d 239, 121 P.2d 523, 524, where the court found duress at the time of signing even though husband used no force and was outside of the state at the time.

received benefit, direct or indirect, from said fraud." But this the court could properly do, if there was no duress. We cannot substitute our judgment for that of the trier of facts. But we feel the court has been influenced by an erroneous view of the law determining what constitutes duress, and in determining what could or could not prevent the exercise of Mrs. Funk's free will. Stacher v. United States, 9 Cir., 1958, 258 F.2d 112, 116. Cf. also: United States v. United States Gypsum Co., 1947, 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746; Smallfield v. Home Ins. Co., 9 Cir., 1957, 244 F.2d 337, 341; American President Lines v. Marine Terminal Corp., 9 Cir., 1956, 234 F.2d 753, 760.

The judgment is affirmed as to the appellant Richard Douglas Furnish and remanded as to Emilie Furnish Funk for redetermination of the question of the existence of duress, or the lack of it, on Mrs. Funk under the modern law.