Charles B. Lang, et al. [1] v. Commissioner. Lang v. Commissioner
Docket Nos. 75325-75327, 81997.
United States Tax Court
T.C. Memo 1961-134; 1961 Tax Ct. Memo LEXIS 217; 20 T.C.M. (CCH) 666; T.C.M. (RIA) 61134; May 15, 1961
*217 1. Held, respondent did not err in determining that petitioner-husband failed to report specific income items in the years 1942 through 1954. 2. Held, respondent did not err in his determination of deficiencies in the income tax of petitioner-wife for the years 1948, 1949, 1952, and 1953. 3. Held: The deficiencies in taxes of petitioner-husband for the years 1942 through 1954 were due in part to fraud with intent to evade tax; additions to tax therefor are sustained; assessment and collection thereof are not barred by the statute of limitations. 4. Held: no part of the deficiencies against petitioners for 1941 or against petitioner-wife is due to fraud; assessment and collection thereof are barred by the statute of limitations for 1941 and 1947. 5. Held: Petitioner-wife omitted from reported income for 1948 and 1949 amounts respectively in excess of 25 percent thereof; assessment and collection of deficiencies for those years are not barred by the statute of limitations. 6. Held, additions to tax under section 294(d)(2) of the 1939 Code sustained, subject to recomputation of tax under Rule 50. Charles P. Duffy, Esq., Yeon Bldg., Portland, Ore., for the petitioners. Leo K. O'Brien, Esq., and John D. Picco, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion In Docket No. 75327, respondent has determined a deficiency in petitioners' income tax for 1941 in the amount of $1,310.18, and an addition to tax under section 293(b) of the Internal Revenue Code of 1939 in the amount of $655.09. *219 In Docket No. 75325, respondent has determined deficiencies and additions to tax under sections 293(b)[2] and 294(d)(2) of the 1939 Code in the income tax of Charles B. Lang for the years 1942 through 1954, as follows: Additions to Tax
Sec.
Sec. 294
Year
Deficiency
293(b)
(d) (2)
1942
$15,779.43
$ 7,889.72
1943
33,703.35
16,851.68
1944
34,961.74
17,480.87
1945
42,510.72
21,255.36
$2,550.64
1946
2,827.60
1,413.80
169.66
1947
8,777.47
4,388.74
526.08
1948
3,988.13
1,994.07
275.96
1949
10,026.24
5,013.12
642.85
1950
14,555.67
7,277.84
916.26
1951
48,248.70
24,124.35
2,878.60
1952
19,431.37
9,715.69
1,235.53
1953
20,814.73
10,407.37
1,247.67
1954
9,467.89
4,733.95
568.07
In Docket No. 75326, respondent determined deficiencies in the income tax of Beulah Lang, overassessments, and additions to tax under sections 293(b)[3] and 294(d)(2) of the 1939 Code, for the years 1947 through 1954, as follows: Additions to Tax
Sec.
Sec. 294
Year
Deficiency
Overassessment
293(b)
(d)(2)
1947
$2,111.57
$1,055.79
$126.69
1948
4,252.12
2,126.06
255.13
1949
2,196.68
1,098.34
131.80
1950
$1,451.81
1951
901.35
1952
555.99
278.00
78.34
1953
202.14
101.07
1954
247.78
*220 In Docket No. 81997, respondent determined a deficiency in the income tax of Beulah for the year 1954. The deficiency notice was issued approximately one year after the issuance of the deficiency notice involved in Docket No. 75326 in which respondent determined an overassessment in Beulah's taxes for 1954. In the later deficiency notice, respondent made the same adjustments for "Unallowable deduction and additional income" by way of rents and capital loss as had been made in the earlier deficiency notice, but did not make any adjustment as had been made in the earlier deficiency notice for "Nontaxable income and additional deductions" by way of dividend income erroneously reported. The issues presented are as follows: (1) Whether respondent properly determined the joint income of petitioners for the year 1941, the individual income of petitioner Charles B. Lang for the years 1942 through 1954, and the individual income of petitioner Beulah Lang for the years 1947 through 1949, and 1952 through 1954. (2) If deficiencies are found, whether any part of any of the deficiencies is due to fraud with intent to evade tax. (3) If no part of the *221 deficiencies against either petitioner for the years 1948 and 1949 is due to fraud, whether either petitioner omitted from reported gross income for those years an amount in excess of 25 percent of reported gross income. (4) Whether either petitioner is liable for additions to tax for substantial underestimate of estimated tax. Findings of Fact Facts stipulated by the parties are incorporated herein by this reference. Petitioners Charles B. and Beulah Lang, husband and wife residing in Portland, Oregon, filed a joint Federal income tax return for the year 1941 and individual returns for each of the years 1942 through 1954 with the district director, or collector, of internal revenue, Portland, Oregon. In Docket No. 75325, respondent has determined adjustments to Charles' reported income for the years 1942 through 1954 for "Unallowable deductions and additional income," as follows: Unreported
Capital
Error in
Year
Income
Dividends
Gains
Addition
1942
$27,845.96
$ 1,500.00
1943
47,122.97
3,550.00
$3,031.20
1944
50,239.76
5,100.00
1945
54,435.68
6,700.00
5,197.40
1946
2,426.67
5,193.75
579.40
1947
21,762.85
5,272.25
1948
8,965.93
12,782.50
1949
15,066.36
13,545.00
1950
6,535.41
19,003.00
3,179.38
1951
47,147.61
19,636.93
7,740.10
1952
14,785.14
20,356.55
$65.31
1953
14,533.73
23,204.80
1954
2,844.23
18,355.00
*222 The notice of deficiency contained explanations of the adjustments for "unreported income" for each year, as follows: (a) Your reported taxable income has been increased [the appropriate annual amount], computed as shown in Exhibit A, A-1, B and B-1 attached hereto. Exhibits A, A-1, B, and B-1 attached to the notice are respectively entitled "Comparative Net Worth Statements," "Nondisbursed Rental Receipts Due and Owing Idella Chow," "Net Worth Increase Adjustments and Computation of Unreported Income," and "Personal Living Expenses." Each exhibit bears in the upper left-hand corner the legend "In re: Charles B. & Beulah Lang." The deficiency notice contained explanations of the adjustments for dividends and capital gain, as follows: (b) It has been determined that the taxable dividend income amounting to [the appropriate annual amount] was omitted from the income reported on the return as shown in Exhibit C-1 attached hereto, and the reported net income is increased accordingly. (c) It has also been determined that taxable capital gain income amounting to [the appropriate annual amount] was omitted from the income reported on the return as shown in Exhibit C-2 attached *223 hereto, and the reported net income is increased accordingly. Exhibits C-1 and C-2 attached to the notice are respectively entitled "Summary of Dividend Income Reportable by Charles B. Lang" and "Consolidated Summary of Net Capital Gains and Losses Reported." Both exhibits bear in the upper left-hand corner the legend "In re: Charles B. Lang." Respondent has determined adjustments to Charles' reported income for the years in issue for "Nontaxable income and additional deductions," as follows: Year
Capital Loss
Rents
1942
1943
1944
$450.58
1945
$ 599.49
1946
1947
1948
2,673.74
1949
2,590.32
1950
1,192.89
1951
1952
3,523.54
1953
533.38
3,502.22
1954
3,725.16
Explanations of the adjustments are contained in the notice of deficiencies as follows: (c) It has been determined that your rental income has been overstated on the return to the extent of [the appropriate annual amount] as outlined in Exhibit C-3. Your net income is decreased accordingly. (d) It has been determined that you had a capital loss of [the appropriate annual amount], and since such capital loss was not claimed on your return, your reported net income *224 is reduced by the amount shown, as outlined in Exhibit C-2. Exhibit C-3 is entitled "Schedule Of Adjustment To Net Rental Incomes Reported By Charles B. Lang." The exhibit bears in the upper left-hand corner the legend "In re: Charles B. Lang." In Docket No. 75326, respondent has determined adjustments to Beulah's reported income for the years 1947 through 1954 for "Unallowable deductions and additional income" as follows: Medical and
Capital
Dental Ex-
Year
Rents
Loss
penses
1947
$1,000.00
1948
$2,673.74
1,000.00
1949
3,601.90
1,000.00
1950
2,322.69
1951
516.68
1952
4,307.83
1,000.00
$70.48
1953
5,228.97
146.53
25.33
1954
5,228.73
1,000.00 The notice contained explanations of the adjustments for rents and capital losses, as follows: (a) It has been determined that you failed to report income from your rental property as outlined in Exhibit A in the amount of [the appropriate annual sum]. Accordingly your reported income has been increased in that amount. (b) On the return you claimed a [capital loss in the appropriate annual amount]. It has been determined that the owner of the securities sold which gives *225 rise to the loss is Charles B. Lang, and consequently not allowable to you. Your reported income is increased by the amount shown. Respondent has also determined adjustments to Beulah's reported income for the years 1947 through 1954 for "Nontaxable income and additional deductions," as follows: Year
Dividends
Capital Gain
1947
$ 950.00
1948
500.00
1949
450.00
1950
2,437.00
$4,635.07
1951
3,639.00
1952
3,898.40
1953
4,868.90
1954
7,283.77
The notice contained explanations of the adjustments, as follows: (b) On the return you reported dividend income of [the appropriate annual amount]. It has been determined that the owner of the securities is Charles B. Lang, and consequently the income would be reportable by him. Your reported income is decreased by the amount shown. (c) On the return you reported capital gain income of $4,635.07. It has been determined that the owner of the securities sold is Charles B. Lang, and reportable by him. Your reported net income is decreased by the amount shown. In Docket No. 75327, respondent has determined one adjustment to the reported income of the petitioners for the year 1941, the only year in issue *226 for which petitioners filed a joint return. This sole adjustment in the amount of $5,779.75 was for unreported income determined on the basis of a computation of the consolidated net worth of the petitioners. Charles is the son of Tom Yet Lang (hereinafter referred to as Tom). Charles was born in China in approximately 1899 and was brought to this country by Tom in 1906. Charles completed grammar school while living with Tom in the rear of a store which Tom operated and in which Charles worked after school hours. Tom ran the store until his retirement in 1933. Beulah is the daughter of Charles Ng Tong and Leong Tong (hereinafter referred to as Leong). Charles Ng Tong operated a dry goods store at his death in 1918, which store Leong continued to operate until the latter part of the 1920's. Beulah was born in Portland in 1897, attended grammar and high schools there and Reed College for approximately 6 months. She worked part time in her mother's dry goods store while attending high school and college. Idella Tong Chow (hereinafter referred to as Idella) is Beulah's younger sister. In the late 1920's she went east to school, married Bacon Chow in 1931, and has lived in the east *227 since that time. Petitioners were married in 1924. Calvin A. Lang (hereinafter referred to as Calvin), petitioners' only child, was born in 1925. Calvin lived with his parents, entered Princeton University in the summer of 1942, and, after an interruption for military service, graduated in 1947. He attended graduate schools at Rutgers and Johns Hopkins Universities, receiving the degree of Doctor of Science from the latter in 1954. In 1949, Calvin married Helen Lew (hereinafter referred to as Helen). They presently reside in Louisville, Kentucky, where Calvin is an assistant professor of biochemistry in the University of Louisville, School of Medicine. In 1919, Tom gave Charles a current model automobile. In 1924, Tom provided $7,200 accumulated wages and gifts to Charles, with which Charles acquired a rental property which he conveyed to Beulah later in the year. In 1926, Tom provided petitioners with some $4,600 to purchase the inventory and fixtures of Leong's store. Tom acquired his residence at a cost of $3,000. Title was taken in Charles' name, was conveyed to Idella in 1926, reconveyed to Beulah in 1931, who sold the property in 1944 for $4,100. In 1925, Leong provided *228 Idella with $15,000 to purchase a rental property and with $10,000 to purchase another rental property. In 1927, Beulah made the down payment of $15,000 on a property out of funds she received from Leong. In 1929, Leong provided petitioners with $9,000 to purchase a store property. Leong and Tom, during the years prior to 1941, made other gifts of cash to both Charles and Beulah. Beulah accumulated some portion of these gifts in a safe deposit box which she, Idella, and Leong rented between 1925 and July 11, 1939, and which she and Charles held subsequent to that date. From 1926 through the years in issue, Charles, with Beulah's assistance, operated a small dry goods store. In 1938, Charles began trading in corporate securities. During the first 5 months of 1940, Charles sold most of the stocks at a loss of $25,559.35. This loss was reported by Charles and Beulah in their joint return for 1940. During the years in issue Charles traded in stocks with increasing frequency. All stocks were acquired in his name with the exception of certain securities acquired in the name of Charles and Beulah jointly. Dividend checks on the stocks were issued to Charles who cashed them. Purchases *229 and sales of all stocks were directed by Charles. Funds used for the purchase of stocks during the period 1941 through 1945 came from the dry goods store, various savings and checking accounts, endorsement over of some checks from a stock brokerage firm, and unidentified sources. Sources for the majority of the funds used to purchase stocks during the years 1941 through 1945 were from identifiable sources. Beulah maintained records of all stock transactions. She prepared Federal income tax returns for herself, Charles, Calvin, Leong, and Helen. At the end of each year Beulah allocated the dividend income from each stock purchased in that particular year or in some prior year to herself, Charles, Calvin, Helen or Leong. Income arising from dividends or profits and losses from the sale of any stock was consistently reported on the return of the person on whose return income from the stock was first reported. For the year 1941, all dividends (there were no gains or losses from sales) on stocks were reported on the petitioners' joint return. During the years 1942 through 1944, some of the dividends, gains, and losses were reported by Beulah on her individual returns and the remainder *230 by Charles on his returns. For 1945, the dividends, gains, and losses were reported on the individual returns of Charles, Beulah and Calvin; for the years 1946 through 1948, on the individual returns of Charles, Beulah, Calvin, and Leong; and for 1949 through 1954, on the individual returns of Charles, Beulah, Leong, Calvin, and Helen. Charles provided money for the payment of taxes on income from stocks reported by Calvin, Leong, and Helen. Except for the income tax returns, all of which Beulah prepared, no accounting was ever given Calvin, Leong, or Helen as to investments, the income from which was reported on their returns. Charles held all income from trading in corporate stocks, including dividends, under his control and did not pay it over to the persons on whose returns it was reported. Charles was the beneficial as well as the legal owner of all stocks he acquired or held during the years in issue. On April 23, 1924, Charles acquired a rental property (hereinafter referred to as the Albina and Russell Street property) with funds provided by Tom. On November 26, 1924, Charles conveyed the property to Beulah. For 1941, rental income from the property was reported on petitioners' *231 joint return; for the years 1942 through 1948, income therefrom was reported on Beulah's individual returns; for the years 1949 through 1954, income therefrom was reported on Calvin's individual returns. In 1947 or 1948, the building was destroyed and a new building erected at a cost of $17,000. On December 31, 1948, Beulah executed a deed conveying the Albina and Russell Street property to Calvin. The deed was not delivered to Calvin, nor was it recorded. In February 1956, petitioners executed, delivered, and recorded a deed again conveying the property to Calvin. Property taxes and insurance on the property were billed to and paid by Beulah. In 1929, the property at 715 S. E. Grand Avenue, Portland (hereinafter referred to as the Grand Avenue property), on which petitioners' store is located, was acquired in Idella's name. Leong provided the initial payment for the purchase price. In 1931, title to the Grand Avenue property was conveyed to Beulah who simultaneously assumed an outstanding mortgage on the property. Title remained in Beulah through the taxable years in issue. Property taxes and insurance on the property were billed to and paid by Beulah. Rental income from the Grand *232 Avenue property was reported by Beulah on her individual returns for the years 1942 through 1948 and 1951 through 1954, but was reported by Calvin for the years 1949 and 1950. Net rental income from the Albina and Russell Street and the Grand Avenue properties reported by Calvin was as follows: Albina and
Grand
Year
Russell Street
Avenue
1949
$ 641.70
$369.88
1950
608.82
520.98
1951
516.68
1952
358.29
1953
1,726.75
1954
1,503.57
In 1927, Beulah acquired a property hereinafter referred to as the Morrison Street property and was the record owner of the property from 1931 through 1954. Rental income from the Morrison Street property was reported by Beulah on her individual returns for the years 1942 through 1948 and 1951 through 1954. Net rental income from the Morrison Street property was reported by Charles on his individual returns for the years 1949 and 1950 in the amounts of $6,889.08 and $5,147.39, respectively. Rental income from a brick building acquired in 1945 at a cost of $20,000 was reported by Beulah for the years 1945, 1949, and 1950, and by Charles for the years 1946 through 1948 and 1951 through 1954. Respondent has determined *233 that the income from this building was properly reportable by Charles for all years in issue. Net rental income from the building reported by Beulah for the years 1949 and 1950 was $4,298.76 and $3,953.50, respectively. Rental income from a brick building acquired during the year 1943 at a cost of $20,000 was reported by Beulah on her individual returns for the years 1944 through 1947 and 1949 through 1951, but was reported by Charles for the years 1948 and 1952 through 1954. Respondent has determined that rental income from the building was properly reportable by Beulah for the years in issue. Net rental income from the building reported by Charles was as follows: Year
Rental Income
1948
$2,673.74
1952
3,204.14
1953
3,502.22
1954
3,725.16
During the course of the investigation by internal revenue agents of petitioners' tax liability, petitioners were cooperative and made such books and records as they had available to the agents, provided the agents with retained copies of their income tax returns for the years 1940 through 1945, and submitted at the agents' request a joint net worth statement. No part of the deficiency in income tax of the petitioners *234 for the year 1941 is due to fraud with intent to evade tax. Parts of the deficiencies in income tax of Charles for the years 1942 through 1954 are due to fraud with intent to evade tax. No part of the deficiencies in income tax of Beulah for the years 1947, 1948, 1949, 1952, and 1953 is due to fraud with intent to evade tax. Opinion BLACK, Judge: The first issue is whether respondent has correctly determined the income tax liability of petitioners for the years in issue. We lay aside the matter of petitioners' joint liability for the year 1941 and Beulah's individual liability for 1947 because our holdings, hereinafter set forth, that no part of the deficiencies in those years is due to fraud with intent to evade tax precludes assessment and collection of any deficiency for those years. We are left then to consider whether respondent has erred in determining deficiencies in the individual income tax of Charles for the years 1942 through 1954 and of Beulah for the years 1948, 1949, and 1952 through 1954. In determining deficiencies in Charles' income tax for the years 1942 through 1954, respondent has made two principal adjustments to Charles' reported income. First, he has *235 adjusted the reported income in each year to reflect unreported income computed by a net worth plus expenditures method. Second, he has made further adjustments to reflect omission of certain specific items of dividend and capital gain income. Respondent, in his computation of Charles' alleged unreported income by the net worth plus expenditures method, utilizes the technique known as the consolidated net worth statement. In so doing, he has consolidated Charles' and Beulah's net worth, although he has not used the net worth method in his determination of deficiencies against Beulah. The technique of the consolidated net worth method involves the computation of increases in the net assets of a taxpayer and those closely related to him. After addition of personal expenditures and other nondeductible items, the incomes reported by both the taxpayer and the others are deducted and the balance is determined to be additional unreported income of the taxpayer. Utilization of the technique of the consolidated net worth computation to determine individual income was approved in William G. Lias, 24 T.C. 280 (1955), affd. 235 F. 2d 879 (C.A. 4, 1956), certiorari *236 denied 353 U.S. 935 (1957). Both this Court and the Court of Appeals, however, noted [4] that the consolidated net worth statement was an "unusual" method, application of which was required by the "extraordinary" situation presented in that case. The situation in the Lias case was that the taxpayer received income from various partnerships with his brother and corporations in which he and members of his family were the stockholders of record, as well as engaged in many large cash transactions of which he kept no records. Corporate dividends were not paid in accordance with record ownership. Bank accounts and other assets of the family group were shifted from one name to another. The taxpayer repeatedly told revenue agents that all the assets of the family were his regardless of ownership of record, and refused to submit a net worth statement. We concluded that the taxpayer "so conducted his own affairs and those of the Lias Group as to make it impossible to identify the individual ownership of assets." Nor were we "persuaded that the [taxpayer] did not create this confused situation deliberately and with purposeful design," 24 T.C. 310. *237 In the present case, Charles not only does not claim that all the assets are his, but has specifically and consistently maintained that many of the assets are not his. It is plain that Beulah owns considerable real estate in her own right; this fact the Commissioner does not dispute. Corporate dividends have been paid in accordance with record stock ownership, although, so Charles contends, not in accordance with beneficial stock ownership. Further, although the income from certain real property has not been consistently reported, there has been no shifting of assets. Finally, when petitioners were requested to submit a net worth statement, they did so. Underlying respondent's specific adjustments removing dividend and capital gain income from Beulah's reported income and adding it to Charles' income is the determination that Charles, not Beulah, was the owner of the securities. The same is true for the specific adjustments by which respondent added to Charles' income the dividend and capital gain income reported on the returns of Leong, Calvin, and Helen. Similarly, the adjustments to the rental income reported by Beulah and by Charles are premised upon determinations as to the *238 ownership of the property from which the income was derived. These specific adjustments made to the reported income of the petitioners, the explanations thereof contained in the notices of deficiencies, and other evidence in the record convince us that the net worth evidence is less reliable than other evidence in the record. After careful consideration of the whole record, we are satisfied that Charles derived income during the years in issue from the operation of a small dry goods store, from his activities in trading in corporate stocks, and from certain rental properties. Either he or Beulah maintained books and records which reflected the income produced from these three operations. Except for the inference to be drawn from the determination that Charles had large sums of additional income shown in a net worth computation, it has been established that Charles had no likely sources of income other than the three above mentioned. It goes without saying, we think, that the Commissioner's determination of the deficiencies against Charles on the net worth basis is presumed to be correct and the burden of proof is on Charles to show that the deficiencies are not correct. That showing *239 is made, we think, in the instant case where the petitioner has proved to our satisfaction what his actual income was from the three above-named sources. He has also proved to our satisfaction that he had no income from any other sources. As set forth in our Findings of Fact, respondent has determined simultaneous and cumulative annual adjustments to Charles' income both for unreported income computed by the net worth method and for omissions of specific items of income actually received. The net worth method may be a reasonable method of determining and proving income in the absence of a more precise method, but it may be less reliable than adjustments based upon specific items. Emilie Furnish Funk. 29 T.C. 279, affd. 262 F. 2d 727 (C.A. 9, 1958). Under all the facts of the instant case, we believe the specific adjustment method to be more reliable in the determination of Charles' individual liability than the consolidated net worth method which respondent has applied. We shall, therefore, decide the case upon the specific adjustment method. This observation is applicable only to Charles' case, as respondent has not used the net worth method in the case *240 of Beulah. To hold, however, that respondent erred in his application of the consolidated net worth method in determining the deficiencies against Charles and in making adjustments to Charles' income as reported on his returns for unreported income so computed, while at the same time making adjustments for omissions of specific items of income, is not to hold that respondent erred in determining the omission of specific items of income. Charles concedes that the omission of rental income items, as determined by respondent, was erroneous and does not now appear seriously to contest those adjustments. He does contest adjustments for omission of specific items of dividend and capital gain income, which range in amount from $1,500 in 1942 to as high as $23,204 in 1953, and aggregate more than $170,000 in all. We have set forth in our Findings of Fact the manner in which the transactions in stocks was accomplished, as well as how accounting therefor was handled by Beulah. Basic to Charles' contention that the income derived from the stocks was properly reported by others in his contention that the stocks were purchased by him for the others from funds of the others which he held in *241 so-called capital accounts. While we have found that Charles father, Tom, and Beulah's mother, Leong, made gifts to Charles and Beulah over the years prior to the years in issue, we are unable to find that either parent entrusted any significant sum to Charles for the benefit of Calvin, or that Leong entrusted any of her funds to Charles for investment. Further, we are unable to find that Charles invested any funds for Beulah in the stock trading in question. While we are satisfied that Beulah possessed not inconsiderable separate funds of her own, we are not convinced that these funds were used in the stock trading transactions. We think her own separate funds were used mainly in the acquisition and improvement of her rental properties. It was from these properties that her income was principally derived. Certainly nothing in Charles' treatment of the stock transactions, the dividends, or the proceeds from sales (save for the tax returns Beulah prepared for the others) is consistent with the fiduciary capacity he contends he filled. He has failed to prove to our satisfaction that he received any money from others to invest for them; his contention that he did so from so-called "capital *242 accounts" of these other persons is not sustained. He held the stock in his own name; he received the dividends on the stock and proceeds from the sale thereof and exercised complete control over them. He has failed to prove that he remitted any of the income so derived to those on whose returns it was reported. He rendered no accounting to the others, save the returns which Beulah prepared. In short, Charles has, in our opinion, entirely failed to show that the stocks and the income derived therefrom belonged to anyone but himself. We hold, therefore, that respondent did not err in determining that Charles received additional dividend, capital gain, and rental income as determined in the deficiency notice during the years 1942 through 1954. Cf. Jeannette W. Fitz Gibbon, 19 T.C. 78 (1952). In the Fitz Gibbon case, among other things, we said: Transactions within a family group are subject to special scrutiny in order to determine if they are in economic reality what they appear to be on their face. * * * It is authoritatively established that where a taxpayer attempts to transfer property and the end result of such transfer does not effect a complete shift in the *243 economic incidence of ownership of such property, the transaction will be disregarded for Federal income tax purposes. This is true because the transferor in such cases retains such control over the property that he is the one who derives the real benefit from the economic gain thereon. * * * With regard to the deficiencies against Beulah, those deficiencies for the years in issue arise from adjustments for omitted rental income, disallowance of claimed capital losses on the sale of stocks, and the disallowance of portions of medical deductions occasioned by the increase in net income. We do not understand that Beulah now contests the inclusion of rental income from certain properties which admittedly she owned; rather, she denies that the omissions were fraudulent. As to the rental income from two properties (the Albina and Russell Street and Grand Avenue properties) which were allegedly transferred to Calvin, inclusion of that income is contested. As to the Grand Avenue property, we only note that we are unable to find that any steps were taken to effect the transfer and further note that the only manifestation of the transfer was the inclusion of income derived therefrom in the *244 returns prepared for Calvin for the years 1949 and 1950. No error is shown in the inclusion of this rental income in Beulah's income for those years. As set forth in our Findings of Fact, a deed conveying the Albina and Russell Street property to Calvin was drafted and executed, although not acknowledged or recorded. It is not clear from the record whether Calvin ever saw the deed, but it is clear that the record fails to disclose sufficient facts from which delivery may be found. It is undoubtedly the law of Oregon, as urged by petitioner Beulah, that where a deed is recorded, lack of physical delivery to the grantee does not defeat passage of title. Halleck v. Halleck, 216 Or. 23 (1959), 337 P. 2d 330. The more applicable rule of Oregon law to the instant case is set forth in Jobse v. United States Nat. Bank, 142 Or. 692 (1933), 21 P. 2d 221, 222, as follows: The legal questions involved here are so well settled in this state that it is not necessary to go beyond our own decisions to sustain them. Under all the decisions, delivery is an indispensable requisite to the validity of a deed. So long as the grantor retains the legal control of an instrument, *245 title under it cannot pass any more than if he had not signed it. To pass the title the grantor must give up dominion and control of the deed. He must part not only with the possession of the deed, but also with the right to recall it or to alter any of its provisions. [Citations] Since neither deed to the property was recorded nor delivery occurred to pass title to Calvin during or prior to the years in issue, we hold that respondent did not err in including the rental income from the property in Beulah's income. The disallowance by respondent of claimed capital loss deductions must necessarily be sustained in view of our conclusion, previously stated, that Charles was the beneficial owner of the stocks, sale of which gave rise to the claimed loss. The adjustments to the medical deduction automatically follow from the correction of net income. We hold, therefore, that respondent did not err in determining deficiencies in Beulah's taxes for the years 1948, 1949, 1952, and 1953, which deficiencies are in issue in Docket No. 75326. With respect to the deficiency which respondent has determined against Beulah for the year 1954, he says in his brief as follows: Respondent admits, *246 however, as indicated in his opening statement, that his determination in Docket No. 81997 is inconsistent with his determination in Docket No. 75326, in that the same income is taxed in Docket No. 81997 to Beulah Lang, an inconsistent position taken solely for the purpose of protecting the revenues in the event of an adverse decision. As we sustain respondent's position in Docket No. 75326, so we sustain petitioner's appeal in Docket No. 81997 as to 1954. There is no deficiency in Beulah's income tax for the year 1954. We turn now to the issue of whether any part of the deficiencies is due to fraud with intent to evade tax. On the resolution of this issue depends the imposition of additions to tax under section 293(b) of the 1939 Code and the assessment and collection of the deficiencies for years prior to 1948 under section 276(a) of the 1939 Code and section 6501(c) of the 1954 Code. For the year 1941, respondent, utilizing the net worth method of reconstruction of petitioners' joint income, has determined that petitioners, who jointly reported net income of $5,336.68, understated their income by $5,779.75. Stipulated corrections in the net worth computation reduce the alleged *247 understatement to $2,479.75. Records of stock transactions for the year were placed in evidence, but apparently by the opening of the investigation in 1954 petitioners had no records of income from the store or rental properties. Respondent has neither determined nor adduced any evidence of omission of specific items of income. Bearing in mind that the burden of proving fraud rests upon respondent, we cannot say that the burden has been carried as to the year 1941. Neither the amount of unreported income, standing alone, nor the failure of petitioners to retain all their books and records for 14 years, nor alleged but unproven alterations in the books, establish fraud. We hold, therefore, that respondent erred in imposing an addition to the tax liability of petitioners for 1941 for fraud and that assessment and collection of any deficiency for that year is barred by section 275(a) of the 1939 Code. Respondent has also determined additions to tax for fraud against Charles for the years 1942 through 1954. We have sustained respondent's determination that Charles omitted from reported income dividends and capital gains derived from dealings in stocks ranging in annual amounts from *248 $1,500 to over $23,000 in 1953, and totaling over $170,000 for all the taxable years. Although Charles sought to establish that this income was not his and was properly reported on the tax returns of others, we are unable to accept his explanation as consonant with the realities of the case. It seems clear to us that Charles caused income which he knew to be his to be reported on the returns of others, and paid the taxes assessed thereon. Such conduct, we think, constitutes fraud with intent to evade tax. The income tax returns of the various parties who reported the dividends and capital gains and losses resulting from Charles dealing in stocks through the years 1942 to 1954, inclusive, are in evidence. So far as we are able to determine these returns, including the returns of Charles himself, in the aggregate reported all the income from dividends and from caiptal gains incident to these stock transactions. But manifestly Charles cannot excuse himself by shifting to members of his family income which was his own. If the ownership of these stocks was in Charles, as we have held, he cannot use a method of allocating the income to respective members of his family even though in the *249 aggregate all dividends and capital gains were reported for taxation by the various parties. Such methods, if sanctioned, would be an easy method of evading a substantial part of the tax. It is the contention of petitioners that the allocation among the different parties was made in accordance with capital accounts which each party had with Charles. We are convinced that there were no such capital accounts. Therefore, the socalled allocation was unwarranted and was without legal effect. Cf. Sam D. Hecht, 16 T.C. 981 (1951). We hold, therefore, that as to Charles for the years 1942 to 1954, inclusive, respondent did not err in the imposition of the additions to tax under section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code, and that under section 276(a) of the 1939 Code and section 6501(c) of the 1954 Code assessment and collection of the deficiencies in years prior to 1948 are not barred. As to respondent's imposition of additions to tax for fraud against Beulah for the years 1947, 1948, 1949, 1952, and 1953, the alleged amounts of understatement of income range from $50 to slightly over $4,000. Part of the understatement of income arises from adjustments *250 disallowing claimed capital losses from the sales of stocks which actually belonged to Charles. The capital losses claimed for those years total approximately $4,100 while Beulah reported during those years dividends on stocks actually owned by Charles totaling approximately $10,600. Thus, the greatest understatement for any one year resulting from such reporting was $550 in 1949, while her income was thus overstated in 1952 and 1953 by approximately $2,900 and $4,700, respectively. Understatements also occurred in the reporting of rental income. Portions of the rental income omitted were derived from the Albina and Russell Street property. While, as we have previously held in sustaining respondent's determination of Beulah's income for these years, the steps taken by Beulah were ineffective to divest herself of ownership of the property and relieve her of reporting the income derived therefrom, we are satisfied that her failure to report the income proceeded from the mistaken belief that the property was no longer hers and not from an intent to evade tax. The remainder of the understatements, save for that arising from automatic changes in medical and dental deduction arising from *251 inconsistent reporting of income from rental properties of Charles and Beulah, which, although erroneous, we do not think was fraudulent or made with intent to evade tax. As we have already pointed out, respondent concedes that the deficiency in Beulah's tax for 1954, and consequently the addition for fraud, is alternative to the deficiencies for earlier years determined against Charles and which we have sustained in part. We hold, therefore, that no part of the deficiencies in Beulah's taxes is due to fraud with intent to evade tax and that assessment and collection of the deficiency for 1947 is barred. The third issue is whether either petitioner omitted from gross income for 1948 and 1959 an amount in excess of 25 percent thereof, so as to permit assessment and collection of the deficiencies under the 5-year statute of limitations provided for in section 275(c) of the 1939 Code. Since we have found the deficiencies in Charles taxes were due to fraud with intent to evade tax, the issue is moot as to him. No contention is raised as to the understatement of Beulah's gross income for 1948 and 1949 save for resistance to respondent's determination of adjustments which increase gross *252 income to the necessary percentage to arrest the running of the statute of limitations. As we have sustained respondent's determination for those years, we hold that assessment and collection of deficiencies for those years is not barred. The parties are agreed that imposition of the additions to tax under section 294(d)(2) of the 1939 Code for substantial underestimation of tax must of necessity follow computation of the taxes due, and it is so held. Decisions will be entered under Rule 50 in Docket Nos. 75325 and 75326. Decisions will be entered for the petitioners in Docket Nos. 75327 and 81997. Footnotes
1. The following proceedings are consolidated herewith: Beulah Lang, Docket No. 75326; Charles B. Lang and Beulah Lang, Docket No. 75327; and Beulah Lang, Docket No. 81997.↩
2. Section 6653(b), 1954 Code.↩
3. Section 6653(b), 1954 Code.↩
4. In Lias v. Commissioner, 235 F. 2d 879, at 881, 882, it is stated: "The Tax Court concluded [24 T.C. at 311]: 'While the consolidated family net worth technique does not appear to have been resorted to heretofore, we think its use is permissible as embraced within the scope of the net worth technique in civil cases of the character under consideration and involving the complexities and unprecedented circumstances presented. In our opinion no substantial injury results to the petitioner. Extraordinary situations require the adoption of unusual methods to resolve them. Mindful of the pitfalls inherent in any net worth method, we approve the respondent's use of the consolidated net worth method in the instant proceedings.' "We agree with the foregoing statement."↩