ESTATE of Walter F. RAU, Sr., Deceased, Raymond J. Shorb, Administrator with the Will Annexed, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16823.

United States Court of Appeals
Ninth Circuit.

March 9, 1962.

Rehearing Denied May 11, 1962.

Ellsworth T. Simpson, Nylen, Gilmore & Simpson, Washington, D. C. (Thomas H. Werdel, Bakersfield, Cal., of counsel), for petitioner.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Moshe Schuldinger, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before BARNES and KOELSCH, Circuit Judges, and YANKWICH, District Judge.

KOELSCH, Circuit Judge.

This is a petition by Raymond J. Shorb, as administrator with the will annexed of the estate of Walter F. Rau to review a decision of the Tax Court of the United States determining a deficiency in the income tax of Walter F. Rau for the years 1942 through 1947, with the addition of 50 per cent to the tax for fraud for each of those years, assessed pursuant to the provisions of section 293 (b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 293(b).

The Tax Court slightly reduced the 1942 tax deficiency and addition assessed by the Commissioner and as modified confirmed his computation and determination for each year as follows:

| Year | Kind of Tax | Deficiency | Addition to Tax |
|------|-------------|------------|-----------------|
| 1942 | Income | $ 5,901.47 | $ 2,778.22 |
| 1943 | Income & Victory | 52,913.50 | 33,454.19 |
| 1944 | Income | 53,725.33 | 28,728.08 |
| 1945 | Income | 46,292.81 | 23,146.41 |
| 1946 | Income | 12,303.72 | 6,151.86 |
| 1947 | Income | 17,214.11 | 8,607.06 |

During the tax years in question Rau had earnings from several sources but the subject of this appeal concerns his income from two businesses—the French Cafe and a bar and a liquor store known as the Southern Wine & Liquor in Bakersfield, California, where he also operated a hotel. The Commissioner determined that the deficiencies were due to Rau's fraudulent understatement in his tax returns of his gross income from the cafe and the bar, coupled with the charging of fictitious expenses and purchases against their purported earnings.

On this review Rau's administrator makes three basic contentions: first, that the Commissioner should have calculated Rau's tax liability upon the net worth method of computing taxable income instead of relying upon specific omissions from income; second, that the evidence is insufficient to sustain the Tax Court's finding that Rau was guilty of making fraudulent returns with intent to evade income tax; and third, that section 293(b) may not be invoked to permit an addition to the actual tax deficiency.

Rau's administrator concedes that Rau failed to accurately report his income in any of the years 1942 through 1947; he also admits that Rau underpaid income tax for the years 1942 through 1945, but he argues that the actual deficiency for the latter years was far less than that determined by the Tax Court and asserts that Rau in fact overpaid income tax for 1946 and 1947; he vigorously contends that the finding of fraud is clearly erroneous and he urges that the death of the taxpayer prior to the assessment of the deficiencies precludes the imposition of the "fraud penalty" provided for by section 293(b).

In making the adjustments and arriving at the decision to increase the assessment, the Commissioner principally relied upon information gained from Robert R. Webb and Rose Goldstein, former employees of Rau.

Webb had been the manager of Rau's hotel and was also in charge of the receipts of the cafe and bar; he had received the receipts and made the bank deposits for both businesses daily; he also kept a daily record in a "year book" of the amounts deposited.

Goldstein had kept Rau's books, made out his income tax returns for all the

several years except 1947 and when Webb was absent from work because of sickness or for other reasons, had handled the receipts. She used the "year books" as the basis for maintaining the cash journal for each business and used the cash journal in conjunction with the checkbook as the basis for preparing Rau's income tax returns.

At the hearing before the Tax Court Webb and Goldstein depicted Rau as an astute and successful business operator who maintained fictitious books and surreptitiously juggled his receipts in order to evade the full impact of the income tax laws upon his earnings; their testimony disclosed, with the precision essential to justify the deficiency assessments levied by the Commissioner and sustained (with but slight modification) by the Tax Court, the amount of taxable income which Rau had not reported in his returns. Accordingly, if these witnesses were credible and their testimony regarding the devious manner in which Rau handled this income and kept his ac-

counts can be believed, then the evidence overwhelmingly supports the Tax Court's finding that the shortage constituted a calculated concealment by Rau of his true income in order to lessen tax liability.[1]

Rau's administrator, however, urges that the Tax Court should have rejected the Commissioner's determination (based upon statements that Rau omitted specific amounts of income from his tax returns) and instead arrived at his income and his tax liability from the proof submitted by Rau's administrator of his increase in net worth during the several tax years.[2] Especially, says the administrator, should the Tax Court have followed this course where the deficiency indicated by accepting "unsubstantial oral testimony" of specific omissions from income is exorbitant and unrealistic as compared to the deficiency disclosed by his net worth proof. Moreover, continues the administrator, the proof of fraud falls far short of being clear and convincing;[3] he points out that the find-

1. In substance their testimony was that Webb did not bank the entire receipts of the cafe and bar, that, complying with Rau's instruction, Webb first deducted a specified amount in cash from the sums turned in to him by the steward of the cafe and the bartenders and only deposited the remainder. He kept the withheld moneys in the hotel safe where they were allowed to accumulate until removed by Rau at the end of each month; these portions of the receipts of each business were not entered in the "year books" and were never reflected in Rau's income tax returns. The witnesses further stated that sometimes, after the deduction was made from the cafe receipts, not much remained; on such occasions Rau directed Webb to make the deposit and purported receipts for the cafe "look respectable" by adding a check drawn on the cafe account in a sufficient amount to increase the deposit to more than $300.00; he further instructed Webb to enter these checks in the checkbook as payment for supplies and the amount was treated as a business expense in his income tax returns. Webb and Goldstein further testified that the cafe steward's "cash payable" for supplies and expenses during the day were not included in the sum entered in the "year books" and cash journal as

income, but that these payments were recorded as expenses in the cash journal and were so reflected in Rau's tax returns. Goldstein also related two other specific instances, one in 1943, the other in 1944, when false figures were employed to lessen tax: The witness testified that in both years after she computed Rau's income tax he told her to "raise the purchases" for the French Cafe in order to reduce his tax and she complied with those instructions. The cash journal and tax returns for the years 1943 and 1944 tend to corroborate her, for there is a discrepancy between the amount expended for the item of "purchases" for the French Cafe. The amounts in the respective tax returns are larger by approximately $15,000.00 in 1943 and $10,000.00 in 1944 than those shown in the cash journal.

2. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

3. Section 7454 imposes the burden of proving fraud on the Commissioner; the cases uniformly hold that a finding of fraud must rest upon evidence that is clear and convincing. See Lusk v. Commissioner, 250 F.2d 591 (7th Cir. 1957), cert. denied 357 U.S. 932, 78 S.Ct. 1376, 2 L.Ed.2d 1375 (1958).; Bond v. Commis-

ing of fraud rests largely upon testimony of two employees who occupied positions of trust in which they were in charge of Rau's money and might well have "siphoned off funds belonging to their employer" and manipulated his records for their own protection in an effort to conceal from him their embezzlement.

■ Careful consideration of these contentions convinces us that each of them lacks merit. In Schellenbarg v. Commissioner, 31 T.C. 1269, 1277, the Tax Court pointed out that "Section 41 of the Code provides, in the event the method of accounting utilized by the taxpayer does not clearly reflect income that 'the computation shall be in accordance with such method *as in the opinion of the Commissioner* does clearly reflect the income.' [Italics supplied.] It is thus apparent that the choice as to the method of reconstruction of income lies with the Commissioner and not the taxpayer, the only restriction being that the method adopted be reasonable."[4] The fact that there is a substantial discrepancy between Rau's income as it appears from his books and his income calculated on the basis of his net worth would alone entitle the Commissioner to invoke the statute. Despite the stipulation that the net worth statement prepared by Rau's administrator and entered into evidence "set * * * forth the assets and liabilities of Walter F. Rau, Sr. on the dates as indicated," the Commissioner was not bound to base his computation upon those figures. The net worth method of determining income "is itself only an approximation" (Holland v. United States, 348 U.S. 121 at 129, 75 S.Ct. 127, at 132 (1954)), and although an acceptable mode of proof, is not necessarily superior to some other recognized method of establishing that fact. Here the Commissioner chose the direct proof given by

two persons who were in a position to know if any sums were not accounted for, and who gave those sums with a high degree of precision.

While it is true that the sums of the specific omissions in each of the several tax years greatly exceed the differences between the net income Rau actually reported and his net income calculated upon the increase in net worth method of computing income, and conceding for present purposes that the testimony of Rau's former employees was not corroborated, nevertheless we are not convinced that these facts either separately or taken together warrant a reversal of the decision.

The Tax Court personally observed the witnesses Webb and Goldstein, and from that vantage point was in a position to evaluate their testimony in the light of their attitude and demeanor while being interrogated. That the witnesses created a favorable impression both as to their integrity and the accuracy of their information is clear, for the court declared that "The testimony of Robert Webb and Rose Goldstein was strong and convincing: * * *. Although there may have been minor inconsistencies, the main thrust of their testimony was credible, consistent, powerful and persuasive."

We cannot say that the Commissioner acted arbitrarily in basing his determination upon the statements of such witnesses or that the Tax Court erred in preferring his proof.

■■ The Commissioner also met his burden of establishing fraud: the net worth computation itself demonstrates that Rau understated substantial amounts of income in all but one of the seven tax years.[5]

"Mere omission of reportable income is not of itself sufficient to warrant a finding of fraud in an income tax case [citations omitted]. How-

sioner, 232 F.2d 822 (4th Cir. 1956), cert. denied 352 U.S. 878, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956); Dreiborg v. Commissioner, 225 F.2d 216 (6th Cir. 1955).

4. Section 41 of the Internal Revenue Code of 1939 (26 U.S.C.A. (I.R.C.1954) § 446

(b); Furnish v. Commissioner, 262 F.2d 727 (9th Cir. 1958).

5. The appellant states in his brief that the net worth computation shows the net income was overstated in 1946 and 1947 but he is in error.

ever, repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud." Furnish v. CIR, 262 F.2d 727, 728 (9th Cir. 1958).[6]

The testimony of Webb and Goldstein confirms that the understatement was fraudulent.

■ The remaining question is whether the addition permitted by section 293 (b) of 50 per cent to the deficiency may be validly assessed after the taxpayer has died. At the outset, the Commissioner, relying upon the statement of the Tax Court that no such issue was raised by the petition in that court, contends the matter cannot now be urged. Rule 7(c) (4) (B) (4) [now Rule 7(a) (2), (c) (4) (ii) (d)] of the Tax Court, 26 U.S.C.A. (I.R.C.1954) § 7453 requires the petition to contain clear and concise assignments of each and every error assertedly committed by the Commissioner. The petition before us includes the statements that the Commissioner erred "(1) * * * in proposing deficiencies and penalties for the years 1942, 1943, 1944, 1945, 1946 and 1947 [and] (2) in determining that petitioner is liable for the 50 per cent fraud penalty * * *" for those years. Although these statements, because of their generality, may not strictly comply with the Rule, nevertheless we think that taken together they are adequate to raise the issue, to which the Tax Court gave some consideration if only in passing.

■ Rau's administrator predicates his contention that the statutory provision may not be invoked to impose liability on a decedent's estate growing out of the fraud of the deceased taxpayer, on the assumption that the " 'addition' [of 50 per cent to the tax] was intended as a penalty for such wrongdoing." His entire argument is devoted to the development of the thesis that section 293(b) is a penal provision and that the assessment is a fine intended as a punishment upon an offender. If section 293(b) imposed a criminal sanction the issue could be easily and readily resolved because of the well settled rule that "[a]t common law, actions on penal statutes do not survive * * *" the death of the wrongdoer. Schreiber v. Sharpless, 110 U.S. 76, 80, 3 S.Ct. 423, 424, 28 L.Ed. 65 (1884). But in Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938) the Supreme Court, having under consideration the purpose of section 293(b),[7] held that it was remedial rather than penal, and a type of legislative enactment "provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud."

■ However, the proposition urged by the administrator—that the death of the taxpayer terminated the right to impose the addition—is not answered by simply pointing to the Supreme Court's classification of the addition as not penal and the statute as remedial and not punitive. It cannot be doubted that the right accrues only when a tort in the nature of a fraud has been committed by a taxpayer. Under the ancient common law as exemplified in the numerous decisions referred to in Sullivan v. Associated Billposters and Distributors, 6 F.2d 1000 (2nd Cir. 1925) the rule was that death of either the injured party or the wrongdoer abated the right of action for torts. The precise basis for this treatment of tort claims is now lost in the mists of an-

6. The administrator urged as a bar to the assessment of the deficiency the prescription of the three-year statute of limitation provided by section 275(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 275(a). However, a further section (276) renders the limitation inapplicable "[i]n the case of a false or fraudulent return with intent to evade tax * * *."

7. Section 293(b) of the Revenue Act of 1939 is identical to section 293(b) of the Revenue Act of 1928 which governed Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938).

tiquity [8] but in any event, with the passage of time the rule came to be regarded as "one of 'the least rational parts' of the law" [9]; and courts began to either narrow its broad sweep (Sullivan v. Associated Billposters, supra), or, being of the opinion that the logical progression of the law in the light of changed concepts and conditions had clearly necessitated a modification of the rule, curtailed its application. Barnes Coal Corp. v. Retail Coal Merchants Assn., 128 F.2d 645 (4th Cir. 1942). Thus, at an early day the courts engrafted upon the rule the qualification that those actions ex delicto survived and could be prosecuted against a decedent's personal representative where the tort consisted of the appropriation by a wrongdoer of specific property by which, or by the proceeds of which, the assets of his estate were increased. In the instant case, however, it is readily apparent that the Government cannot bring itself within that exception, so that if the early law is given a broad application the result would be that section 293 (b) was erroneously applied in this situation. But a number of circuits have con-

cluded that the right created by section 293(b) does survive because, to use the language of the First Circuit in Kirk v. Commissioner, 179 F.2d 619, 622, 15 A.L.R.2d 1031 (1950), they have "fel[t] at liberty to abandon enrichment of a decedent's estate as any criterion of survivability in cases like this because it is evident from the cases cited last above, and those cases cited therein, that the enrichment concept of the early law of survival was the product of archaic legal preconceptions identifying the representative personally with the estate in his charge which have little or no place in the law today." See Scadron's Estate v. Commissioner, 212 F.2d 188 (2nd Cir. 1954); Lee v. Commissioner, 227 F.2d 181 (5th Cir. 1955) and Reimer's Estate v. Commissioner, 180 F.2d 159 (6th Cir. 1950). A number of these decisions are expressly based upon the reasoning of the Tax Court in Reimer's Estate v. Commissioner, 12 T.C. 913, 920, 921 (1949), which is epitomized in the statement that "The primary purpose of taxation is to obtain money which the sovereign may use in the performance of its many governmental functions. The direct result

8. In his work entitled "Law of Torts" (2nd ed.) 1955, Mr. Prosser states at pages 206 and 207 that the "origins of the rule that personal tort actions die with the person of the plaintiff or the defendant is rather obscure—the more so as contract actions which were equally 'personal' were held to survive the death of either. The best conjecture on the subject is that it was the development of the tort remedy as an adjunct and incident to criminal punishment. * * * Since the defendant could not be punished when he was dead it was natural to regard his demise as terminating the criminal action and the tort liability with it."

"Sir Frederick Pollock, in his Work on Torts (11th ed. p. 61), discussing the effect produced on liability for a death of either the person wronged or the wrongdoer, declares it to be one of the 'least rational parts' of the law; and he also declares that 'when once the notion of vengeance has been put aside, and that of compensation substituted, the rule 'actio personalis moritur cum persona' seems to be without plausible ground.

First, as to the liability, it is impossible to see why a wrongdoer's estate should ever be exempted from making satisfaction for his wrongs. It is better that the residuary legatee should be to some extent cut short than that the person wronged should be deprived of redress.' The same writer, on page 71, after stating the rule that the right of action survives against the executor in cases where the decedent has added to his own estate property or the value or proceeds of property belonging to another, states that the rule is 'limited to specific acquisitions or their value. It does not include the recovery of damages, as such, for a wrong, though the wrong may have increased the wrongdoer's estate in the sense of being useful to him or saving him expense' "

The last quoted matter is extracted from Sullivan v. Associated Billposters & Distributors, 6 F.2d 1000 at 1003.

9. The passage appears in Sullivan v. Associated Billposters & Distributors, supra, and is a quotation contained in Pollock on Torts, 11th ed. p. 61.

of a taxpayer's filing of a fraudulent income tax return which understates his true tax liability is to deprive the sovereign of money it is entitled to receive and obligated to collect. It also makes it necessary for the Government to expend other public funds in order to uncover the fraud and collect the proper amount of the tax due. These are monetary losses. Consequently we feel that the taxpayer's wrongful act is in the nature of an injury to the property of the United States."

We find ourselves in accord with the several circuits and with the Tax Court in Reimer, supra, and conclude the addition should be upheld.

The judgment is affirmed.