DONALD R. BOLTON, SR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent DONALD R. BOLTON, SR., and LUCILLE S. BOLTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bolton v. Commissioner
Docket Nos. 1720-73, 1721-73 and 1722-73.
United States Tax Court
T.C. Memo 1975-373; 1975 Tax Ct. Memo LEXIS 3; 34 T.C.M. (CCH) 1602; T.C.M. (RIA) 750373; December 31, 1975, Filed *3 In addition to being employed as a salesman, petitioner conducted a scrap metal business during the years 1965 through 1969. During 1968 petitioner also raised and sold hogs. Petitioner did not maintain adequate records with respect to these activities and it is impossible to determine the amount of income he realized therefrom using what records he did maintain. Petitioner failed to include income from the scrap metal business on joint returns filed with his wife for 1965 and 1969. Petitioner failed to report income from the scrap metal business on individual returns filed for 1966, 1967 and 1968. Petitioner also failed to include income from the sale of hogs on his individual return for 1968. Held, respondent's determinations of omitted income for each of the years 1965 through 1969 are not arbitrary and excessive. Held,further, whereas respondent reconstructed taxable income for each year using the specific items method of proof, petitioner has not met his burden of proof by offering a reconstruction of income based on the net worth method of proof. Held,further, part of the underpayment for each year was due to fraud. Jeff D. Batts and Pressley B. Brawley, Jr., for the petitioners. *4 Eric B. Jorgensen, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in Federal income tax and additions to the tax pursuant to section 6653(b)[1] as follows: Docket
Income
Additions
Name
No.
Year
Tax
to Tax
Donald R. Bolton, Sr.
1720-73
1966
$ 1,847.58
$ 923.79
1967
1,639.73
819.87
1968
2,346.45
1,173.23
Donald R. Bolton, Sr., and
1721-73
1969
6,157.42
3,078.71
Lucille S. Bolton
Donald R. Bolton, Sr., and
1722-73
1965
2,277.82
1,138.91
Lucille S. Bolton
The issues presented for decision are: (1) Whether respondent's determinations of deficiencies for the years 1965 through 1969 are arbitrary and excessive. (2) Whether petitioner has overcome the presumption in respondent's favor by use of an indirect method of reconstructing income (net worth) in light of respondent's determinations which were based upon a direct method of reconstructing income (specific items omitted). (3) The amounts of allowable deductions for cash purchases of scrap metal and for labor expense when petitioner failed to maintain adequate records. (4) Whether any part of the underpayment for each of the *5 years 1965 through 1969 was due to fraud. (5) Whether assessment and collection are barred by the statute of limitations with respect to the years 1965, 1966 and 1967. FINDINGS OF FACT Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are found accordingly. Donald R. Bolton, Sr., and Lucille S. Bolton are husband and wife who resided in Troutman, N.C., throughout the years in question and at the time the petitions were filed in this case. The income tax returns for the years in question were timely filed with the Southeast Service Center, Chamblee, Ga. The deficiencies for the years 1965 and 1969 are with respect to joint returns filed by the Boltons. The deficiencies for 1966, 1967 and 1968 are with respect to individual returns filed by Donald R. Bolton, Sr. (hereafter referred to as petitioner). Petitioner was employed as a salesman for the Sherrill Machinery Company and for the Troutman Foundry. Petitioner also conducted his own scrap metal business, which consisted of buying scrap metal and processing it to be resold at a profit. Most of the scrap metal was purchased by petitioner in Kannapolis, N.C., which was about *6 30 miles from Troutman. Ordinarily petitioner used a borrowed truck to transport the scrap metal from Kannapolis to Troutman. Occasionally petitioner bought scrap metal from people who brought it to his place of employment or to his home. On these occasions he paid for the metal in cash. The "processing" included separating the various metals and cleaning them up for resale. Petitioner dealt mostly in used copper, brass and aluminum. Often the brass had copper fittings which would have to be cut off. Some of the copper was bought in the form of used copper wiring which was coated with rubber, fiber glass or another metal. In order to salvage the copper the coating was burned off. All of the work in petitioner's scrap metal business was tedious and difficult. The work was done outdoors and could only be done as weather permitted. Petitioner had no permanent employees. He hired people on a day-to-day basis depending both on the amount of work he had and on the number of people he could find willing to work. The workers were usually paid in cash at the end of each day. During the course of their investigation, respondent's agents repeatedly asked petitioner for the names of the persons *7 who helped him process the scrap metal. Petitioner was unable to recall a single name. At trial, however, petitioner produced a list of 25 people whom he claimed to have employed at various times during the years in question. Four witnesses testified that they worked periodically for petitioner in the scrap metal business. Each of these witnesses testified that others were also employed at various times. Each testified that he was paid in cash at the end of each day but none of the witnesses could recall the number of days worked or the total amount of remuneration. Estimates of the daily wage ranged from $ 16 to $ 30. Petitioner did not report any sales made in the scrap metal business on his income tax returns for the years 1965 through 1969. Petitioner failed to maintain complete and adequate records of sales and expenditures incurred in the scrap metal business, and with regard to some transactions he maintained no records at all. It is impossible to determine, from what records he did maintain, the amount of income derived from the scrap metal business for any of the years involved. Using records maintained by third parties, respondent determined that petitioner's efforts in the *8 scrap metal business resulted in the following sales: 1965
1966
1967
1968
1969
Levin Brothers,
$ 3,844.00
$ 4,706.15
$ 10,429.81
$ 8,115.44
$ 23,835.60
Burlington,
N.C.
Sherrill Machinery
Company
Troutman, N.C.
535.75
278.25
160.97
125.00
294.00
Troutman Foundry,
4,899.55
1,859.14
167.60
0
0
Troutman,
N.C.
TOTAL
$ 9,279.30
$ 6,843.54
$ 10,758.38
$ 8,240.44
$ 24,129.60
Again using records maintained by third parties, respondent determined that petitioner expended the following amounts in acquiring scrap metal: 1967
1968
1969
Sherrill Machinery Company
$ 4,588.09
$ 2,296.56
$ 5,480.57
Troutman Foundry
977.04
City of Statesville
1,860.60
Watts Plumbing & Heating Co.
175.00
T. B. White
57.50
Total
$ 5,565.13
$ 2,354.06
$ 7,516.17 Although petitioner claimed to have made substantial purchases of scrap metal for cash, he was unable or unwilling to provide respondent's agents with the names of the people he bought from, or the amounts he purchased, or the amounts paid for such purchases. In computing petitioner's income from the scrap metal business, respondent allowed deductions for travel expenses for the years 1965 through 1969 of $ 66, $ 66, $ 165.60, $ 94.80 and $ 248.40, respectively. These expenses were incurred in transporting the scrap *9 metal to petitioner's place of business and in delivering it to petitioner's customers after it had been processed. Respondent arrived at these amounts by using cancelled checks and by estimating the cash payments. In estimating the cash payments respondent allowed ten cents per mile. Respondent determined the number of miles by multiplying the number of miles in a round trip from Troutman, N.C., to Burlington, N.C. (location of Levin Brothers, Inc.--petitioner's principal customer), by the number of trips made each year. Respondent allowed a deduction for labor expense for the year 1969 in the amount of $ 305.60. This amount was determined from microfilm records of canceled checks drawn on petitioner's checking account. Respondent did not allow any further deductions for labor expense because there were no records to substantiate further expenses and because petitioner was unable or unwilling to provide respondent with the names of the people he claimed to have paid in cash. During 1968 petitioner was also in the business of selling hogs. The gross receipts from this business, in the amount of $ 1,072.96, were not reported on petitioner's income tax return for 1968. Expenses incurred *10 in connection with the sale of hogs amounted to $ 231. The deficiencies asserted arise from the unreported income that petitioner realized from the scrap metal business and from the sale of hogs. Petitioner does not dispute respondent's figures for gross receipts from these activities. Petitioner contends, however, that expenses in each year were much higher than the amounts allowed by respondent. Petitioner specifically claims higher expenses for purchases of scrap metal and for labor. Not having records to support his claimed expenses, petitioner has submitted computations to indicate what his taxable income was for each year using the net worth method of proof. In this connection petitioner employed Leroy Sides (hereafter referred to as Sides), an accountant, to compute taxable income using the net worth method of proof. Working with petitioner, Sides compiled a comparative net worth statement for the years in question as set forth below: COMPARATIVE NET WORTH STATEMENT [2] *12 - DONALD R. BOLTON, SR., AND LUCILLE S.
BOLTON
Item
Assets
12-31-64
12-31-65
1.
Cash on Hand
$ 1,000.00
$ 1,000.00
2.
Cash in Bank
North Carolina
National Bank
(NCNB)
Joint checking
account Donald
and
Lucille Bolton
1,067.29
185.02
3.
Cash in Bank
NCNB, checking
account, Donald
R.
Bolton, Sr.
4.
Cash in Bank
NCNB, savings
account, Lucille
S.
Bolton
5.
Cash in Bank
Home Savings and
Loan
Association,
savings account,
Donald R.
Bolton,
Sr., and Lucille
S. Bolton
6.
Personal Auto
1964 Station
4,590.00
4,590.00
Wagon
7.
Personal Auto
1968 Mercury
Station Wagon
8.
Gun Collection
2,000.00
2,000.00
9.
Coin Collection
1,500.00
1,600.00
10.
Antique Auto
Collection
1,637.50
1,637.50
11.
Cabin Cruiser
(1/2 interest)
800.00
800.00
12.
1966 Beachcom-
ber and Motor
13.
Trucks
2,090.00
2,090.00
14.
Residence
(purchased in
1959)
15,000.00
15,000.00
15.
Lot (adjoining
residence pur-
chased in 1959)
$ 1,000.00
$ 1,000.00
16.
Lot (adjoining
residence pur-
chased in 1960)
1,075.00
1,075.00
17.
Lake property
(1/2 interest)
1,000.00
2,883.54
TOTAL ASSETS
$ 32,759.79
$ 33,861.06
Liabilities
18.
Home Mortgage
with Home Sav-
ings and Loan
Association,
Statesville, NC
6,256.41
5,412.53
19.
Auto, Truck
Loans with
Universal
C.I.T., Con-
cord, N.C.
1,466.80
684.40
20.
Loan with NCNB
21.
Loans from Mrs.
G. G. Sherrill
22.
Depreciation -
Trucks
116.80
816.20
TOTAL
$ 7,840.01
$ 6,913.13
$ 7,981.00
LIABILITIES
Net Worth
(subtract total
liabilities from
total
assets)
$ 24,919.78
$ 26,947.93
NET WORTH
$ 2,028.15
INCREASE
*11 COMPARATIVE NET WORTH STATEMENT [2] - DONALD R. BOLTON, SR., AND LUCILLE S.
BOLTON
Item
12-31-66
12-31-67
12-31-68
12-31-69
1.
$ 1,000.00
$ 1,000.00
$ 1,000.00
$ 1,000.00
2.
1,123.12
4,568.26
622.99
1,437.54
3.
1,923.29
324.26
4.
150.35
5.
1,000.00
6.
4,590.00
4,590.00
7.
4,235.03
4,235.03
8.
2,400.00
2,400.00
4,095.00
7,070.00
9.
1,700.00
1,800.00
2,060.00
2,160.00
10.
1,637.50
1,637.50
1,763.08
2,823.08
11.
12.
1,954.70
1,954.70
1,954.70
1,954.70
13.
2,212.20
2,212.20
2,212.20
1,978.05
14.
15,000.00
15,000.00
17,650.00
17,650.00
15.
$ 1,000.00
$ 1,000.00
$ 1,000.00
$ 1,000.00
16.
1,075.00
1,075.00
1,075.00
1,075.00
17.
2,883.54
2,883.54
2,883.54
2,883.54
$ 36,576.06
$ 40,121.20
$ 42,474.83
$ 46,741.55
18.
4,594.31
3,667.77
2,646.70
1,498.20
19.
995.16
0
1,390.35
370.76
20.
1,591.53
761.31
189.30
21.
800.00
600.59
(16.82)
8.30
22.
737.40
1,474.80
494.55
$ 5,767.07
$ 5,684.33
$ 2,371.81
$ 28,595.06
$ 34,354.13
$ 36,790.50
$ 44,369.74
$ 1,647.13
$ 5,759.07
$ 2,436.37
$ 7,579.24 After computing the increase in net worth from year to year, Sides made the following adjustments to arrive at a determination of taxable income for each year: COMPUTATION OF TAXABLE INCOME USING NET WORTH METHOD
1965
1966
1967
1968
1969
Increases in net
$ 2,028.15
$ 1,647.13
$ 5,759.07
$ 2,436.37
$ 7,579.24
worth
Add: 1. Federal Income
1,375.90
1,505.38
2,043.47
2,600.63
3,248.14
Taxes Paid
2. F.I.C.A. Taxes
348.00
554.40
558.72
637.18
729.46
Paid
3. Nondeductible
Losses on
Trade-in of: Boat
500.00
Auto
3,035.03
4. Gift to Son
1,071.00
5. Personal
7,196.44
8,333.32
8,260.99
8,860.72
12,508.42
Living Expenses
TOTALS
$ 10,948.49
$ 12,540.23
$ 16,622.25
$ 18,640.93
$ 24,065.26
Subtract: 1. Nontaxable
Income: Gifts
(346.00)
(525.00)
(1,000.00)
(2,225.00)
(2,394.00)
Insurance
proceeds (amount
paid in
when policy
(983.52)
matured)
2. Exemptions
(3,000.00)
(3,000.00)
(3,000.00)
(3,000.00)
(3,000.00)
Allowable (Four)
TAXABLE INCOME
$ 7,602.49
$ 9,015.23
$ 12,622.25
$ 13,415.93
$ 17,687.74
The disparity between the parties' reconstruction of taxable income for each year is illustrated by the following chart: 1965
1966
1967
1968
1969
1. Taxable income as reported on returns [3] *13 $ 7,503.19
$ 8,877.38
$ 10,976.06
$ 12,149.35 [4]
$ 17,230.58
2. Taxable income as computed by
17,083.67
15,858.24
16,554.54
18,980.90
33,290.01
respondent [5]
3. Taxable income as computed by petitioner using net worth method
7,602.49
9,015.23
12,622.25
13,415.93
17,687.74
4. Omitted income admitted by petitioner (difference between net worth computation of taxable income and reported income)
99.30
137.85
1,646.19
1,266.54
457.16
5. Omitted income as computed by respondent
9,580.48
6,980.86
5,578.48
6,831.55
16,059.43 Before preparing the net worth statement, Sides reviewed the public records of Iredell County to determine what property was recorded in petitioner's name, his wife's name, or in their joint names. In addition to the property included in the net worth statement, the county records indicate that during 1968 petitioner owned a 1958 Chevrolet; *14 during 1969 petitioner owned a 1966 Ford; and from 1966 through 1969 petitioner owned a seventeen-foot boat. Petitioner explained that the 1966 Ford and 1958 Chevrolet were cars that he might have purchased for his son, but he was not certain. Petitioner also testified that he might have purchased a 1963 Chevy II for his son during the period in question. No explanation was offered as to the omission of the seventeen-foot boat from the assets listed in the net worth statement. Petitioner and his wife opened a joint savings account at the Merchants & Farmers Bank of Statesville, N.C. (later North Carolina National Bank) on September 23, 1958. A bank statement dated December 31, 1969, indicates a balance in this account of $ 929.73. This account does not appear in the net worth statement. Sides explained that although he requested the bank to provide him with records of all accounts, no records were provided with respect to this account. Four separate savings accounts were maintained at North Carolina National Bank during the years in question in the joint names of one or both of petitioners and one of their children. Petitioner testified that he never made a deposit to any of these *15 accounts, but that his wife may have made deposits to these accounts. Between September 25 and October 3, 1968, petitioners withdrew $ 300 from their joint savings account and $ 500 from their son's savings account and deposited a total of $ 800 in their joint checking account. Petitioner testified that the $ 500 might have been withdrawn from his son's account in order to make a deposit on the 1968 Mercury stationwagon. None of the four savings accounts in the joint names of petitioners and their children were listed as assets in the net worth statement. Several inconsistencies appear between the net worth statement and petitioner's testimony. For instance, petitioner testified that the lot adjoining his residence which he acquired in 1959 was a gift from his father-in-law. Yet petitioner told Sides that he paid $ 1,000 for this lot. Similarly petitioner testified that his share of the purchase price of the Lake property was $ 800; yet his share of the original cost of this property is listed on the net worth statement as being $ 1,000. During the years in question, petitioner dealt principally in cash as is illustrated by his custom of cashing rather than depositing checks made out *16 to him. An analysis of the cancelled payroll checks drawn by Sherrill Machinery Company to petitioner indicates as follows: Total
Number of
Number
Checks
Amount
Year
of Checks
Deposited
Total Amount
Deposited
1965
54
1
$ 5,578.28
$ 950.50
1966
54 [6]
0
6,180.68
1967
53
3
8,441.38
3,286.78
1968
54
2
8,554.50
1,487.48
1969
54
4 [7]
11,320.58
4,717.39
Total
269
9
$ 40,075.42
$ 10,442.15
Petitioner likewise cashed, rather than deposited, most of the checks he received for scrap metal sales. From 1965 through 1969 Sherrill Machinery Company and Troutman Foundry Company made 80 checks payable to or on behalf of petitioner totaling $ 29,443.24 for scrap metal sold to them. Of these, only five were deposited--totaling $ 1,012.25. The following table shows how much was deposited from the checks drawn by Levin Brothers, Inc., to petitioner for scrap metal sold to it. Total
Number of
Number
Checks
Amount
Year
of Checks
Deposited
Total Amount
Deposited
1965
3
0
$ 3,844.00
0
1966
3
0
4,706.15
0
1967
6
0
10,429.81
0
1968
3
2 (partially)
8,115.44
$ 4,959.79
1969
9
6 (partially)
23,835.60
15,075.64
Total
24
8
$ 50,931.00
$ 20,035.43
During *17 1968 petitioner received two checks from the White Packing Company for hogs which were sold to that company. One check, in the amount of $ 602.66, was deposited and the other check, in the amount of $ 470.30, was cashed. The joint and separate income tax returns for the years 1965 through 1969 were prepared by Myrtle Fox. Generally, petitioner gave the information to be included on the return to his wife, who transmitted it to Mrs. Fox. Mrs. Fox was not provided with information regarding either the scrap metal or livestock operations. When asked by respondent's agent, during the course of his investigation, as to whether he realized that he had omitted income from each of the returns, petitioner replied, "Yes, I never did give it too much thought. I did just what most people do who are in the business and I'm sure you know that most people do the same thing." Petitioner's wife told respondent's agents that she was aware of the income her husband was deriving from the scrap metal business and that she did not tell the return preparer about this income. On September 25, 1972, petitioner entered a plea of guilty to willfully and knowingly making and subscribing Forms 1040, U.S. Individual *18 Income Tax Returns, for the calendar years 1968 and 1969 under the penalties of perjury, which returns he did not believe to be true and correct as to every material matter, in that the forms failed to record any gross receipts from the sale of scrap metal and from the sale of livestock, in violation of section 7206(1). Due to the evidence presented at trial, respondent has made two concessions on brief. Respondent would now allow a deduction for labor expense equal to ten percent of gross sales for each year. Additionally, respondent would now allow a deduction for cash purchases of scrap metal equal to 30 percent of gross sales for the years 1965 and 1966. OPINION Petitioner concedes that he failed to report gross receipts and income derived from the sale of scrap metal and from the sale of hogs during the years in issue. As petitioner did not maintain adequate records, respondent used records maintained by third parties to arrive at a computation of taxable income based on the specific items method of proof. Petitioner views respondent's determination as arbitrary and excessive because respondent failed to allow deductions for cash expenditures allegedly incurred for purchases of *19 scrap metal and for labor. Petitioner contends that as respondent's determination is arbitrary and excessive, the presumption in respondent's favor disappears under the holding of Helvering v. Taylor,293 U.S. 507 (1935). Petitioner further contends that he has met his burden of persuasion by a presentation of taxable income, reconstructed by way of the net worth plus expenditures method of proof.
Except with respect to the issue of fraud, respondent's determination is presumptively correct and petitioner has the burden of proof. Welch v. Helvering,290 U.S. 111 (1933). Where respondent's determination is arbitrary and excessive the presumption in his favor disappears. Helvering v. Taylor,supra.We cannot agree that respondent's determination in this instance is arbitrary and excessive. During the course of their investigation, respondent's agents repeatedly requested petitioner to provide them with the names of the laborers employed in the scrap metal business. Petitioner was either unwilling or unable to cooperate; nor would petitioner provide respondent's agents with the names of the individuals or companies from whom he claimed to have made purchases of scrap metal for cash. *20 Petitioner told respondent's agents that he had no idea of the amount of purchases in 1965 and 1966. At trial petitioner testified to the names of 25 different people who had been employed in the scrap metal business. Several of these people testified that they had been employed by petitioner and that they had been paid in cash. Neither petitioner nor the laborers could testify, however, to the number of days worked or the total amount of wages paid in any one year. Petitioner's testimony regarding cash purchases of scrap metal was not any more enlightening. He could only testify that additional purchases had been made and he did not provide the Court with the names of the people he bought from, dates of purchases, or amounts purchased. In light of the fact that petitioner did not provide respondent with the names of laborers or with other leads from which respondent could have made an approximation of petitioner's labor expense and expense for additional purchases of scrap metal, we are unable to find respondent's determination arbitrary and excessive. Herbert Schellenbarg,31 T.C. 1269 (1959), affd. in part and revd. in part on another issue 283 F. 2d 871 (6th Cir. 1960). Petitioner *21 must still overcome the presumption in respondent's favor by a preponderance of the evidence. Admitting that he cannot directly disprove respondent's determination because he failed to maintain records of his claimed expenditures, petitioner urges this Court to accept his computation of taxable income based upon an indirect method of proof--the net worth plus expenditures method. The net worth method is, under some circumstances, an acceptable method of proof. We are not convinced, however, that it should be used here. A taxpayer is required to maintain such records as will enable him to file a correct return. Section 1.446-1(a) (4), Income Tax Regs.; section 1.6001-1(a), Income Tax Regs. If a taxpayer fails to maintain adequate records, the Commissioner may adopt such method of reconstructing income as in his opinion clearly reflects income. Section 446(b); Herbert Schellenbarg,supra.We indicated in Schellenbarg at 1277 that the choice as to the method of reconstruction to be employed lies with the Commissioner and not the taxpayer, the only restriction being that the method adopted be reasonable. See Rau's Estate v. Commissioner,301 F. 2d 51 (9th Cir. 1962), affg. a Memorandum *22 Opinion of this Court. We likewise held in Emilie Furnish Funk,29 T.C. 279 (1957), affd. in part and revd. in part on other grounds, 262 F. 2d 727 (9th Cir. 1958), that the Commissioner's direct method of proof was preferable to the indirect method (net worth) proposed by the taxpayer. Taking into account the concessions made by respondent, we find his method of reconstruction and the resultant determinations reasonable. Moreover, we find respondent's method of reconstruction preferable to the method proposed by petitioner. Even if we were convinced that this is a proper case for the use of the net worth method of proof, we would not be satisfied that petitioner's computations under that method are reliable. Several items were omitted from petitioner's listing of assets. Petitioner has not offered a satisfactory explanation for these omissions. It is difficult to imagine, for instance, that petitioner could have inadvertently forgotten about the joint savings account maintained at the North Carolina National Bank. Additionally, we note the lack of documentation for the amounts included for many of the assets listed. In particular the amount of "cash on hand" is an estimation based *23 on petitioner's recollection. In light of petitioner's custom of dealing primarily in cash we are not convinced of the accuracy of the amounts included in his net worth statement under the heading of "cash on hand." Due to the evidence presented at trial with respect to laborers employed by petitioner, respondent has indicated in his reply brief that he would be agreeable to allowing a deduction for labor expense equal to ten percent of gross sales for each year. In light of the fact that petitioner could not identify any of the laborers for respondent's information prior to trial, we find respondent's concession at this point to be timely. Additionally, under the rule of Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), we find this to be a reasonable approximation of the labor expense. Also due to information elicited at trial regarding cash purchases of scrap metal, respondent has indicated in his reply brief that a deduction for cost of goods sold should be allowed in the years 1965 and 1966 equal to 30 percent of gross sales for each of those years. Under the rule of Cohan v. Commissioner,supra, we find this to be a reasonable approximation of the expenses involved. With these *24 adjustments conceded by respondent, we uphold his determination of deficiencies asserted for each year. The remaining issue is whether any part of the underpayment for each year was due to fraud within the meaning of section 6653(b). The burden of proof is on respondent to prove by clear and convincing evidence that some part of the deficiency in each year was due to fraud with an intent to evade tax. Section 7454(a); Arlette Coat Co.,14 T.C. 751 (1950); Rule 142(b), Tax Court Rules of Practice and Procedure.
Petitioner maintains that respondent has not established a specific purpose to evade a tax believed to be owing. However, as we said in M. Rea Gano,19 B.T.A. 518 (1930) at 532: To establish fraud by direct proof of intention is seldom possible. Usually it must be gleaned from the several transactions in question and the conduct of the taxpayer relative thereto. *** Having considered the transactions here in question and petitioner's conduct relative thereto, we are convinced some part of the underpayment for each year was due to fraud. We have found that petitioner failed to report substantial amounts of income over a period of five years. It is well established that consistent *25 failure to report substantial amounts of income over a number of years is effective evidence of fraudulent intent. Schwarzkopf v. Commissioner,246 F. 2d 731 (3d Cir. 1957), affg. a Memorandum Opinion of this Court; John Harper,54 T.C. 1121 (1970), acq. 1971-2 C.B. 2; Kurnick v. Commissioner,232 F. 2d 678 (6th Cir. 1956), affg. a Memorandum Opinion of this Court. The fact that petitioner failed to maintain adequate records and with respect to some transactions kept no records at all also tends to support a finding of a fraudulent intent to evade taxes. Woodham v. Commissioner,256 F. 2d 201 (5th Cir. 1958), affg. a Memorandum Opinion of this Court; William H. Parsons,43 T.C. 378 (1964), acq. 1969-2 C.B. XXV. Petitioner's failure to cooperate with respondent's agents, in not providing them with the names of the people he claimed to have employed, is a further indication of fraudulent intent. Granat's Estate v. Commissioner,298 F. 2d 397 (2d Cir. 1962), affg. a Memorandum Opinion of this Court; Millikin v. Commissioner,298 F. 2d 830 (4th Cir. 1962), affg. a Memorandum Opinion of this Court. Finally, we note that petitioner admitted to respondent's agents that, although he had *26 not given much thought to it, he knew when he filed the returns that he was omitting income. Having filed joint returns for the years 1965 and 1969 both petitioners are jointly liable for the deficiencies for those years. Section 6013(d). Furthermore, both are liable for the additions to the tax under section 6653(b) for 1965 and 1969. Petitioner testified that his wife knew of the income derived from the scrap metal business and that she transmitted the information to be included in the returns to the return preparer. Petitioner's wife admitted to respondent's agents that she knew about her husband's scrap metal business and the income derived therefrom. Yet she failed to provide the return preparer with any information regarding that business and she signed the joint returns knowing that they did not reflect the income from the sale of scrap metal. We find that part of the underpayment for each of the years 1965 and 1969 was due to the fraud of petitioner's wife. She is, therefore, jointly liable for the additions to the tax under section 6653(b) for those years. Having found that part of the underpayment for each of the years 1965 through 1969 was due to fraud, the assessment and *27 collection of deficiencies for the years 1965, 1966 and 1967 are not barred by the statute of limitations. Section 6501(c)(1). Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. The following items were estimated based on petitioner's best recollection: 1.; 6.; 9.; 11.; 15.; and 16. The following items were stipulated: 2.; 3.; 4.; 5.; 7.; 12.; 18.; 19.; and 20. The following items were partially estimated and partially documented (cancelled checks and invoices): 8.; 10.; and 17. The following items were documented: 13. and 21. Item 14 was partially stipulated and partially documented.↩
3. The figures for 1965 and 1969 reflect taxable income as reported on the joint returns for those years. The figures for 1966, 1967 and 1968 reflect the combined amounts reported by petitioners on their individual returns for those years. 4. Petitioners' computations show this amount as $ 12,149.39. The returns for 1968 indicate, however, that the actual amount reported was $ 12,149.35. ↩
5. Because petitioners' computation for taxable income is based upon the net worth method, combining husband and wife's net worth for each year, we have added the amount reported by Lucille individually (which was not contested by respondent) to the amount of taxable income recomputed by respondent for Donald, for comparison purposes. The amounts recomputed by respondent are those listed in the notices of deficiency and do not reflect concessions made by respondent on brief.↩
6. Respondent's reply brief [at p. 62] indicates that the total number of checks for 1966 was 55. We find the total number to be 54. ↩
7. Respondent's reply brief [at p. 62] indicates that two checks were deposited in 1969 for a total of $ 4,101.25. We find that four checks were deposited in 1969 for a total of $ 4,717.39.↩